**L. W. FOSTER SPORTSWEAR CO., Inc.**

**v.**

**The UNITED STATES.**

**No. 77–65.**

United States Court of Claims.
Jan. 24, 1969.

---

—————◆—————

Erwin Lodge, Philadelphia, Pa., attorney of record, for plaintiff.

Lawrence S. Smith, Washington, D. C., with whom was Asst. Atty. Gen., Edwin L. Weisl, Jr., for defendant.

Before COWEN, Chief Judge, and DURFEE, DAVIS, COLLINS, SKELTON and NICHOLS, Judges.

## ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

DAVIS, Judge.

This case, which is before the court on cross-motions for summary judgment, was referred to Commissioner Richard Arens, to whom we are greatly indebted. We adopt much of the statement of facts directly from his report to the court and come to the same conclusion.

This controversy arises out of two contracts entered into in 1958, under which plaintiff agreed to manufacture and deliver approximately 54,000 goatskin flying jackets for use of the Department of the Navy. Plaintiff requested the contracting officer to make an equitable adjustment in contract price under the Changes article to reimburse it for additional costs allegedly resulting from defective specifications and improper inspections. From a denial by the con-

tracting officer of an equitable adjustment under the contracts, plaintiff appealed to the Armed Services Board of Contract Appeals which denied the appeal.[1] In this court, plaintiff challenges the ASBCA decision as being arbitrary and capricious, not supported by substantial evidence, and as being erroneous as a matter of law in designated particulars. Plaintiff also asserts alternately that it is entitled to recover on the same facts on a theory of breach of contract. Since its claims were entirely redressable under the contract, however, plaintiff is limited to that relief. It cannot maintain a separate breach of contract action which seeks no further or different relief. Fort Sill Associates v. United States, 355 F.2d 636, 183 Ct.Cl. 301, 304 (1968); Morrison-Knudsen Co., Inc. v. United States, 345 F.2d 833, 170 Ct.Cl. 757 (1965).

From 1949 to 1956, plaintiff sucessfully manufactured approximately 200,-000 flying jackets for the Bureau of Aeronautics of the Department of the Navy under a series of contracts which contained specifications the same as or very similar to[2] those in the contracts in suit. In the performance of these prior contracts, plaintiff was permitted by the Navy to make certain deviations from the specifications, and plaintiff was thoroughly familiar with the practices and procedures used by Navy inspectors in inspecting the jackets. In 1956 the Military Clothing and Textile Supply Agency (MCTSA), an agency created under the Department of the Army, assumed responsibility for procurement of flying jackets of this type, but until entering into the instant contracts the MCTSA had never contracted for any such flying jackets. Prior to letting the instant bids,

the MCTSA prepared Interim Quality Assurance Provisions (IQAP) relating to inspections of the flying jackets. These were then approved by the Navy and incorporated in the contracts. The provisions of the IQAP were substantially the same as those which governed the inspections under the prior contracts.

At the time it entered into these contracts, plaintiff did not discuss with MCTSA the problems which it encountered under the prior contracts, but "took it for granted" that any such problems would be resolved in the same manner in its performance under the new contracts, and that it would be permitted to make deviations from the specifications in order to produce an acceptable garment. Plaintiff's agent testified before the ASBCA that plaintiff "envisioned no difference" as to what would constitute an acceptable garment under the present contracts, because, although the procurement agency was different, plaintiff was contracting to make the same jackets which it had previously made for the Navy.[3]

On April 29, 1958, plaintiff was awarded the first of these contracts for 37,712 flying jackets to be delivered in designated quantities by August 27, 1958, September 26, 1958, and October 27, 1958, respectively. On May 21, 1958, plaintiff was awarded the second of the contracts for an additional 16,328 flying jackets, approximately one-third of which were to be delivered by July 21, 1958, another one-third by August 20, 1958, and the final one-third by September 19, 1958.

Because of the failure of goatskin suppliers to make delivery as agreed, plaintiff's actual production did not begin until August 1958. As a result of this delay, the parties agreed to an ex-

1. ASBCA No. 7567 dated April 20, 1962.

2. The ASBCA found that the specifications were the same as those under the previous contracts; the trial commissioner determined that they were not identical. We conclude that the gist of the Board's finding was that the specifications were substantially identical and that the commissioner's conclusion is not opposed to

this. If it is, we are required to accept the Board's, the plaintiff not having convinced us that that finding was not supported by substantial evidence.

3. The contract documents provided that the flying jackets were to have a perforation reading "U.S. Navy" and were to be delivered by the manufacturer to various Navy depots.

tension of the delivery schedule but with a reduction in contract price. Thereafter, plaintiff made deliveries over a period from January to June 1959 of the prescribed quantity of jackets under the first contract, and made deliveries from October 1, 1958 to April 23, 1959, of 11,-159 of the 16,328 jackets called for under the second contract. Because the deliveries under both contracts were later than the delivery schedule as extended, the contracting officer terminated both contracts, with the result that certain questions, not here at issue, were presented to and decided by the ASBCA.[4]

From the commencement of its production, plaintiff complained to defendant regarding the specifications, the IQ AP and the inspections, which plaintiff felt were too stringent and based in part upon a misinterpretation of the specifications and the IQAP.

Plaintiff felt that the specification requirements for the type of seams for the joining of the knit to the leather and the rayon lining underneath were not in accordance with the best considered practices of the trade, were virtually impossible to perform without causing abrasions and cut leather which would be scored as defects, and that the operation should be performed by another method. Another problem developed with regard to the method of sewing the pocket flap to the face of the jacket. Plaintiff contended that the method prescribed by the specifications was inconsistent with the contract diagram, was "practically impossible" to accomplish and could cause damage to the jacket. After lengthy discussions with resident government inspectors, plaintiff thought that an agreement had been reached for it to perform the operation in accordance with the method it had suggested, but thereafter the government inspectors instructed plaintiff's operators to revert to the method prescribed by the specifications. In the latter part of August 1958, plaintiff complained to the contracting officer about both problems. About a month later the contracting officer authorized plaintiff to perform both operations in accordance with the methods which plaintiff had suggested.

The evidence disclosed that a government inspector, who had never before inspected goatskin or leather products and who had not previously known what a "briar scratch" and a "healed scar" were on animal hide, was scoring as major defects healed scars and healed briar scratches. He was also scoring as defects mended knits which did not affect appearance or serviceability. By letter of October 31, 1958, plaintiff took up both matters with the contracting officer who, by letter of November 21, 1958, agreed that certain healed scars and healed briar scratches should not be scored as defects and that certain others should be scored as only minor defects; and that mended knits, which did not affect appearance or serviceability, should not be scored as defects.

On November 26, 1958, when the contracting officer was visiting plaintiff's plant, plaintiff complained that the specification requirements for 10 to 12 stitches per inch resulted in needle chews and excessive holes in the jackets, and that the requirement for a certain size margin and for cutting a loop after back-stitching resulted in breakage of the knit and other defects. The contracting officer agreed with plaintiff and orally authorized it to use fewer stitches per inch, to change the size of the margin, and to leave the loop in place uncut. This authorization was confirmed by the contracting officer by letter dated December 2, 1958.

Plaintiff's agent testified before the ASBCA in effect that although the foregoing problems resulted in rejections which in turn caused "tightened inspection" of the jackets, defendant did not resume "normal" inspections until Janu-

---

4. The ASBCA decided that the acceptance by the Government of deliveries under the first contract "rendered moot" one of the questions there presented, and that the termination of the second contract was premature. As indicated in the body of this opinion, however, these decisions are not now in question.

ary 16, 1959, some several weeks after the problems had been resolved; but that after the changing of the specifications and establishment of proper inspections, plaintiff was able to create and maintain an even flow of work, with a peak of nearly 3,000 units per week.

The record reveals that in the process of resolving some of the foregoing problems, plaintiff contacted personnel of the Bureau of Aeronautics of the Navy who expressed views to the MCTSA.

In denying plaintiff's appeal, the ASB CA stated that plaintiff was "aware that it could not or did not intend to manufacture in strict compliance with the specifications" ; that the evidence failed to establish that the difficulties encountered because of the specification requirements "were not the normal, minor, and relatively insignificant specification requirements which often necessitate slight adjustment in mass production and for which additional compensation is neither sought nor expected" ; that the "delay, if any, in reaching satisfactory solutions \* \* \* must be charged to [plaintiff] because of its failure to timely alert the contracting officer of the problems known to it before the contract award" ; and that while "some evidence indicates error in certain matters on the part of an inspector", "[t]he record will not support a finding that the defects scored in the inspections were not in fact defects as defined by the specifications nor that lot rejections were not made as dictated by the contract provisions."

■ We hold that the ASBCA's characterization of the specification defects as minor is not supported by substantial evidence and that its ruling that the delay was attributable primarily to the plaintiff was erroneous. Therefore we reverse the Board, hold that the plaintiff is entitled to an equitable adjustment in the contract price, and suspend our proceedings in order for the parties to return to the Board for a determination of the amount of the adjustment.

There is no doubt, in the first place, that the specifications were defective.

The record clearly reflects instances in which defendant's agents admitted as much. The Government later amended the specifications in question, incorporating many of the changes found necessary in the performance of this contract. The ASBCA actually assumed that they were defective, finding that the plaintiff had been granted deviations under its earlier contracts, and that the design requirements "could not be strictly complied with"; the Board's ruling rested on its characterization of the defects as minor and its allocation of fault to the plaintiff.

The Government argues that, even though there were defects in the specifications, they did not make performance impossible. Plaintiff's officers admitted that single garments could be produced under these limitations—they became unworkable only when applied to the production of flying jackets in mass quantities. This court has adopted an approach to impossibility based on "commercial impracticability" which fully embraces the concept that "commercial practicability ceases where the demands of mass procurement can no longer be satisfied through the means of mass production." Natus Corp. v. United States, 371 F.2d 450, 456, 178 Ct.Cl. 1, 10 (1967). In Natus, supra, and Clark Grave Vault Co. v. United States, 371 F.2d 459, 178 Ct.Cl. 52 (1967), we held that the Government did not guarantee that a contractor could successfully and profitably produce an item by a means chosen entirely by him from several alternatives available. Here the plaintiff was forced to make the jackets by particular procedures and according to detailed standards spelled out in the specifications, which were not compatible with mass production—an entirely different situation. See also Centre Mfg. Co., Inc. v. United States, 392 F.2d 229, 233, 241, 183 Ct.Cl. 115, 121–122, 136 (1968).

These defects were not the "normal, minor, and relatively insignificant specification requirements which often necessitate slight adjustments in mass production and for which additional compensa-

tion is neither sought nor expected." They related to the methods of (1) combining the leather, rayon and knit elements of the jacket, (2) sewing on the pocket flap, (3) sewing all the leather seams (number of stitches per inch), (4) completing each seam (backstitching), (5) attaching the wristbands and waistband to the jacket (the size of the margin), and (6) to the types of repairs which would be tolerated (inspection of mended knits). Almost the only parts of the job which would not be affected by these functions are the size of the jackets and the construction and sewing on of zippers. While we give great deference to the expertise and hence to the findings of the Board on these matters (cf. Red Circle Corp. v. United States, 398 F.2d 836, 842, 185 Ct.Cl. 1 (July 1968)), here the record does not at all support the Board's conclusion that these defects were so minor as to be *de minimis* or expectable in ordinary course. The only inference the record will properly sustain is that the defects were material and significant.

 It is now familiar law that a contractor is entitled to an equitable adjustment under the Changes article for increased costs of performance due to defective specifications. Bell v. United States, 404 F.2d 975, 186 Ct.Cl. —— (Dec. 1968); Red Circle Corp. v. United States, 398 F.2d 836, 841–842, 185 Ct.Cl. 1 (July 1968); Centre Mfg. Co., Inc. v. United States, supra, 392 F.2d 229, 232–233, 241, 183 Ct.Cl. 115, 121, 136 (1968); Maxwell Dynamometer Co. v. United States, 386 F.2d 855, 872, 181 Ct. Cl. 607, 634 (1967); Hol-Gar Mfg. Corp. v. United States, 360 F.2d 634, 638, 175 Ct.Cl. 518, 524 (1966); J. D. Hedin Constr. Co., Inc. v. United States, 347 F. 2d 235, 246, 171 Ct.Cl. 70, 85–86 (1965). However, we have consistently held that "an experienced contractor cannot rely on government-prepared specifications where, on the basis of the government furnished data, he knows or should have known that the prepared specifications could not produce the desired result for ' * * * he has no right to make a use-

less thing and charge the customer for it.' R. M. Hollingshead Corp. v. United States, 111 F.Supp. 285, 286, 124 Ct.Cl. 681, 683 (1953)." J. D. Hedin Constr. Co. Inc. v. United States, *supra*, 347 F.2d at 241, 171 Ct.Cl. at 77; See also, Allied Contractors, Inc. v. United States, 381 F. 2d 995, 1000, 180 Ct.Cl. 1057, 1064–1065 (1967); Beacon Constr. Co. of Mass. v. United States, 314 F.2d 501, 504, 161 Ct. Cl. 1, 7 (1963); Ring Constr. Corp. v. United States, 162 F.Supp. 190, 191–192, 142 Ct.Cl. 731, 734 (1958); Anthony M. Meyerstein, Inc. v. United States, 137 F.Supp. 427, 431, 133 Ct.Cl. 694, 700 (1956); DuBois Constr. Corp. v. United States, 98 F.Supp. 590, 594, 120 Ct.Cl. 139, 169 (1951); cf. Leal v. United States, 276 F.2d 378, 383, 149 Ct.Cl. 451, 460 (1960); Ragonese v. United States, 120 F.Supp. 768, 770–771, 128 Ct.Cl. 156, 162 (1954).

The rationale of these two lines of cases is that the contractor can rely upon the Government's representations as to how a desired product should and can be made, unless he ought to know better. In the latter situation, he cannot argue that he has been misled or that he had any right to make his bid on the basis of the specifications which he knew (or should have realized) were not correct. The rule is parallel to the ordinary defense to a suit for misrepresentation that the plaintiff did not, or had no right to, rely upon the challenged statement.

Plaintiff admittedly knew that it could not produce an acceptable flying jacket under the contract specifications, as written, at the time that it submitted its bid. But it had had five or six previous contracts with the Navy for the same type of jacket, with the same or very similar specifications, and in every case deviations were made and allowed as a matter of course—and had to be made for production to go on. Both the plaintiff and the Navy were aware of this past history, and necessarily relied upon it in entering into new contracts of the same type. We have no doubt that plaintiff would have a sound claim if the Navy had abruptly changed its practices under the same con-

tract specifications. We likewise have no doubt that plaintiff would not have to indicate at the time it bid on the successor Navy contracts that it expected to obtain the same deviations. See Franklin Co. v. United States, 381 F.2d 416, 420, 180 Ct.Cl. 666, 673–674 (1967). Does it make any difference that plaintiff was dealing in this instance with the MCTSA and not the Navy?

■ There is no finding and little evidence that the MCTSA actually knew of the defects in the specifications or the prior practice with regard to deviations from the flying jacket contract requirements, or that it had consulted with the Navy prior to the award concerning the problems involved in this sort of procurement.[5] But the actual knowledge of the MCTSA is not controlling. In considering the sufficiency of the Government's defense to plaintiff's claim for relief arising out of defective specifications, the Board is not confined to the subjective knowledge of the procuring agency but must look to the reasonableness of the contractor's actions and beliefs. The issue is whether or not the contractor reasonably believed that the MCTSA knew of the defects and could be expected to continue the pattern of deviations established in prior procurements of the same jackets. If that was a reasonable assumption, plaintiff cannot be said to know, or have reason to know, that the specifications and standards which would actually be used in performance would be faulty.

Recently, in J. A. Jones Construction Co. v. United States, 390 F.2d 886, 182 Ct.Cl. 615 (1968), we considered a somewhat comparable problem relating to inter-agency relationships. That plaintiff contracted with the Army Corps of Engineers, acting as construction agency for the Air Force, to build certain facilities at Cape Kennedy. At the time the contract was let, the Air Force, but not the Corps of Engineers, knew that a large, high priority ICBM construction program, based on the payment of premium wages, was to be undertaken in the same area. The resulting drain on the labor force caused the plaintiff to incur greatly increased labor costs. We held that, in those circumstances, the Air Force had a duty to disclose the information to persons contracting with the Corps of Engineers on its behalf (or to warn them), since there was a "meaningful connection" between the two agencies with respect to the procurement which cast an affirmative responsibility upon the Air Force as the using agency.

■ In this case the relationship between the Navy and MCTSA, with respect to this procurement, was such that the contractor could reasonably anticipate that they would consult, that the latter would learn from the former of the deviations which had been permitted, and that the new agency would follow the same policies. Foster was to produce jackets with a perforation reading "U. S. Navy" and to deliver them directly to various Navy depots. The procurement was therefore on behalf of the service with which the plaintiff had previously worked directly in supplying these same jackets. As already indicated, the specifications were identical or very closely similar to those used in the Navy contracts. Furthermore, the MCTSA was not a separate and independent government unit[6] but was within the Defense Department, and in particular was the successor purchasing agency to the Navy

---

5. Although the trial commissioner considered "one can surmise that this would have been most likely", this speculation has no support in the findings of the Board and is not so indisputably clear from the record that the court can make the finding itself.

6. We have said that "a truly independent federal agency should not be charged with knowledge of what another is doing simply because both are components of the same Federal Government." J. A. Jones Constr. Co. v. United States, supra, 390 F.2d at 891, 182 Ct.Cl. at 625. See Bateson-Stolte, Inc. v. United States, 172 F.Supp. 454, 145 Ct.Cl. 387 (1959); Bateson-Stolte, Inc. v. United States, 305 F.2d 386, 158 Ct.Cl. 455 (1962).

procurement office for textile products like these jackets. In these circumstances we hold that the only acceptable conclusion is that plaintiff acted reasonably in relying upon the likelihood that the knowledge of the former agency would be carried over into the latter, that the contractor would be treated as before in its jacket procurement contracts, and that it could act as if the Navy were still the procuring unit. In short, plaintiff acted reasonably in assuming that the formal change in procurement offices did not rupture the relationship which had already been established between the contractor and the Government with respect to the manufacture of these particular garments. From this it follows that the Board was in error in holding that Foster was to blame for the damages resulting from the faulty specifications. The burden of the defective plans and contract requirements, including any delay in remedying the defects, remains upon the Government.

One matter remains. As pointed out above, plaintiff argued before the ASBCA and this court that the government inspectors applied the wrong standards and made specific mistakes in scoring defects in the finished garments, leading to the imposition of more stringent inspection standards, and a greater cost of performance. It is clear that most of these claims are included in the defective specifications item. The defects were scored because the specifications made competently constructed seams and mendings unacceptable and because the inspection standards (which were part of the specifications) imposed faulty requirements. As we understand it, the ASBCA's opinion reaches this same conclusion: "The record will not support a finding that the defects scored in the inspections were not in fact defects as defined by the specifications nor that lot rejections were not made as dictated by the contract provisions." To us this means no more than that the jackets were rejected because they failed to conform to the defective aspects of the faulty specifications (including inspection standards)

—the aspects which were ultimately cured by the allowance of deviations.

However, there were a number of specific erroneous rejections of jackets for healed scars, healed briar scratches, and mended knits to which the ASBCA apparently referred in its finding that "it is true that some evidence indicates error in certain matters on the part of an inspector," but that there was no evidence that these errors resulted in the rejection of otherwise acceptable lots. Our holding that the specification errors were the Government's responsibility might change this conclusion; the specific wrongful rejections might have a greater impact when coupled with the rejections based on the defective specifications. This case must be returned to the ASBCA for a determination of the equitable adjustment, and at that time the plaintiff may attempt to convince the Board that these specific erroneous inspections resulted in additional damage to it.

The Government's major contention throughout this case has been that the damages suffered by the plaintiff were wholly or largely attributable to its inability to procure enough leather to begin and maintain a uniform production. Plaintiff's counsel has agreed that, upon return of the case to the Board, the Government will be free to introduce evidence and otherwise press this defense. We do not read the ASBCA opinion as disposing of this contention, and therefore this defense is open to the Government at the hearings before the Board on the proper amount of an equitable adjustment.

We hold, in sum, that plaintiff is entitled to an equitable adjustment in the amount of its increased costs as a result of the defective specifications (including inspection standards), and suspend proceedings for 90 days in this court in order for the parties to return to the Armed Services Board of Contract Appeals for a determination of the proper amount of such an adjustment, in accordance with this opinion, either on the present record or after further evidence is produced, as

the Board may decide. To that extent plaintiff's motion for summary judgment is granted and defendant's is denied. Plaintiff will comply with Rule 100 and the General Order of April 1, 1968.