**DOYLE SHIRT MANUFACTURING CORPORATION**

v.

**The UNITED STATES.**

**No. 445–71.**

United States Court of Claims.

July 14, 1972.

Theodore M. Kostos, Philadelphia, Pa., atty. of record, for plaintiff; Samuel H. Sagett, Philadelphia, Pa., of counsel.

Sheldon J. Wolfe, Washington, D. C., with whom was Asst. Atty. Gen. Harlington Wood, Jr., for defendant.

Before COWEN, Chief Judge, LARAMORE, Senior Judge, and DAVIS, SKELTON, NICHOLS, KASHIWA and KUNZIG, Judges.

ON PLAINTIFF'S MOTION AND DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

KASHIWA, Judge, delivered the opinion of the court:

This is a Wunderlich Act case by plaintiff, a shirt manufacturer. The

case results from the Government's termination for default by plaintiff of a shirt manufacturing contract and the subsequent denial of plaintiff's appeal by the Armed Services Board of Contract Appeals. Plaintiff filed a motion for summary judgment in which it contended that the decision of the Armed Services Board of Contract Appeals failed to comply with the standards of the Wunderlich Act, 41 U.S.C. §§ 321, 322. Defendant filed a cross-motion for summary judgment on the grounds that the aforementioned Board's decision is neither arbitrary nor capricious and is based upon substantial evidence, and that, to the extent legal questions were resolved, said Board's decision was correct and should be affirmed by the court. We hold for the defendant, allowing defendant's cross-motion for summary judgment and denying plaintiff's motion for summary judgment.

The facts are set out in detail in the Board's decision and need be only summarized here. A Government contract was awarded on January 16, 1968, to plaintiff for the manufacture and delivery of 98,640 "shirts, men's, cotton poplin, soft collar, khaki #2111, Type III, Class I," at a unit price of $2.61. The total contract price was $257,450. The contract required that the shirts be fabricated from contractor-furnished material which conformed to the color requirements set forth in specification MIL–C–507E, revised April 29, 1966:

> 3.3.1 Matching—The color shall match the standard sample under natural (north sky) daylight or artificial daylight having a color temperature of 7500° degree Kelvin and shall be a good approximation to the standard sample under incandescent lamplight at 2800° degrees Kelvin.

The contract also set forth a procedure for evaluating shade by comparison to certain standard samples in defendant's laboratory, and it permitted inspection or loan of these samples. Quantities of shirts and delivery dates under the contract were as follows:

> 9,880 in the 30 day period before June 14, 1968
>
> 14,800 in the 30 day period ending July 14, 1968
>
> 19,720 in the 30 day period ending August 13, 1968
>
> 19,720 in the 30 day period ending September 12, 1968
>
> 19,720 in the 30 day period ending October 12, 1968
>
> 14,800 in the 30 day period ending November 11, 1968

On May 7, 1968, plaintiff received approval to accelerate deliveries at no extra cost to the Government. By June 27, 1968, the entire quantity of 98,640 shirts had probably been fabricated, and they were definitely completed by the end of July, 1968.

To meet these requirements, plaintiff ordered 175,000 yards of "khaki shade #2111 combed poplin" from Tanenbaum Textile Company, a large supplier. The dyeing of this cloth was done under two separate contracts between Tanenbaum and Sayles Biltmore Bleacheries, Inc., a prominent finisher, the first covering material known as Dye Lot 3961 and the second covering material known as Dye Lot 4129. Sayles shipped this material directly to plaintiff.

On April 4, 1968, plaintiff requested a waiver for shade failure for 66,610 yards of khaki cloth. This yardage was part of 142,116 yards of cloth in Dye Lot 3961. On May 17, 1968, defendant approved the waiver subject to a reduction of $1,520 in the contract price, stating that it "[did] not waive its rights to reject future quantities of supplies containing the same or other nonconformities or its rights to terminate the contract for any existing default." A modification to the contract executed on May 20, 1968, reflected this waiver and price reduction, and Shirt Lot No. 1 consisting of 33,305 shirts was accepted under this waiver.

By letter dated May 27, 1968, plaintiff requested a waiver of shade failure for another 17,253 yards of cloth from the above-mentioned Dye Lot 3961. This

cloth was Shirt Lot No. 3, consisting of 8,628 shirts. Also on the same date, plaintiff requested a similar shade waiver for 26,913 yards of cloth representing shirt Lot No. 4, consisting of 13,452 shirts. This yardage was part of Dye Lot 4129. Plaintiff proceeded to put the cloth into production without waiting for approval. In a letter dated June 24, 1968, confirming a telephone conversation of June 21, 1968, defendant advised plaintiff that its requests for waivers in Shirt Lots 3 and 4 were denied.

Shirt Lot 1, which was accepted on a waiver, was determined by defendant's laboratory to have a "Category 4" shade defect. The Board of Contract Appeals found that Category 4 applied to deficiencies that were negligible or of no adverse effect on appearance or serviceability. Shirt Lots 3 and 4 were rejected because they fell within "Category 3" defects, which meant that the deficiency partially affected appearance when appearance is of major importance or that it seriously affected appearance when appearance is not of major importance.

At plaintiff's request a meeting was held on June 27, 1968, attended by representatives of plaintiff, defendant, plaintiff's supplier, and the bleaching company. Sample swatches of cloth used in Shirt Lots 3 and 4 were again examined in the testing laboratory and compared with the standard sample and the shade range used by defendant. This re-examination verified that the swatches taken from the cloth used in Shirt Lots 3 and 4 were definitely outside the shade range used by defendant in the testing laboratory for shade-matching purposes. The contracting officer advised that a waiver would not be granted even though the cloth had already been cut and made into shirts on the assumption that a waiver would be granted. The commanding general agreed, however, at plaintiff's request to review the contracting officer's denial of the requested waivers, but on July 15, 1968, he advised that he agreed with the contracting officer's action. By July 8, 1968, plaintiff had delivered a total of 79,600 shirts consisting of 33,305 shirts (Lot No. 1) which had been accepted under the waiver and of 46,295 shirts which conformed to the specifications.

As of mid-July, 1968, 19,040 shirts were still due to be delivered under the contract. By letter of September 26, 1968, defendant advised that it would consider terminating the contract for default if plaintiff failed to deliver an additional 4,240 shirts by October 12, 1968. Plaintiff replied in a letter dated October 9, 1968, that:

> The final shipment has been completed and ready for acceptance a long time ago, however, a request for a waiver has not been granted. We are still requesting further consideration and hope to obtain said waiver, at which time goods will be shipped as a final shipment for said contract.

In October and November, 1968, plaintiff failed to deliver the undelivered October requirement and the entire November requirement. In this period plaintiff continued its efforts to convince defendant to accept all or part of the shirts already fabricated from the material found to be defective. In a letter dated November 27, 1968, defendant advised that termination would be initiated if plaintiff failed to notify within ten days from the receipt of the letter of its election to replace the shirts or to show cause why defendant should not terminate the contract for default. Plaintiff took neither course, and on January 2, 1969, the contracting officer terminated the contract for plaintiff's default, the non-delivery of 19,040 shirts.

Plaintiff appealed from the contracting officer's decision to the Armed Services Board of Contract Appeals. On December 8, 1970, the Board denied plaintiff's appeal. It found that the phrase "a good approximation" meant that the cloth must fall within the Government's shade range and that plaintiff had knowledge of this interpretation. The Board also found that the issuance of some previous waivers for shade failure

did not estop the Government from refusing to issue the waivers to plaintiff. Under the circumstances, the Board concluded that the Government acted properly in terminating the contract for default.

None of the parties expected that the shade #2111 could be matched exactly, hence the "good approximation" language in the contract. This allows a limited variation in shade within a certain range. As a consequence, defendant and plaintiff each developed its own collection of color swatches which had been accepted under previous contracts. The controversy in this case has developed over whose shade range is controlling. The contract provided as paragraph 104.15:

SHADE EVALUATION OF CONTRACTOR FURNISHED COMPONENTS. Contracts awarded under this Invitation for Bids (Request for Proposal) will be subjected to the following shade evaluation procedure for contractor-furnished components:

a. For yard goods, a 4″ x 12″ shade swatch (for narrow loom material such as tapes, webbing, ribbons, streamers, etc., swatches will consist of material full width and 12″ in length) will be cut by the contractor from those pieces or rolls selected by the Government, without cost to the Government, in accordance with the following table:

| | *Nr. of Pieces To* |
| *Lot Size* | *Be Sampled* |
| 1 to 5 pieces........... | Each piece |
| 6 to 40 pieces.......... | 5 pieces |
| 41 to 100 pieces........ | 10 pieces |
| Over 100 pieces......... | 15 pieces |

b. The swatches will be evaluated for shade by the Government Laboratory. Should any of the swatches be rejected, end items made from the lot of components represented by the submittal will be rejected. In addition, contractor will cut shade swatches as above from each of the other pieces in the lot of components, not previously sampled, without cost to the Government. Each swatch will be submitted to the Government for shade evaluation.

It specifically notified plaintiff that swatches of contractor-furnished cloth would be evaluated for shade by defendant in its laboratory and that, should any of the swatches be rejected, end items (the completed shirts) made from the lot of components represented by the submittal would be rejected. Having agreed to that provision of the contract, plaintiff could not create an independent shade range which would be binding on defendant. To permit otherwise would contravene a clear provision of the contract. Of course, plaintiff could establish a shade range for its own convenience, but to allow each supplier of clothing to the Government to be its own judge of whether its cloth was the right color would make the objective of a standard color almost unattainable. The shirts involved herein were part of a military uniform. Consequently, it is much better to have one centralized approval authority, and that is precisely what the contract provided for. In addition to the clear language of paragraph 104.15, *supra,* there is substantial evidence supporting the Board's conclusion that plaintiff was fully aware or should have been that, in ascertaining whether the cloth was a good approximation of the standard sample, defendant would compare sample swatches with its shade range. We find that it was understood in the industry that upon request by any finisher, prior to shipping the dyed cloth, sample swatches could be submitted to defendant's laboratory in Philadelphia, Pennsylvania, for a nonbinding courtesy testing. Plaintiff's supplier, Tanenbaum Textile Co., Inc., was not only aware of this practice but also specified in its purchase orders for dye lots 3961 and 4129 that its finisher, Sayles Biltmore Bleacheries, would "Before shipping get color approval from Philadelphia [defendant's laboratory]."

However, despite this explicit language, the finisher did not secure this color approval (courtesy testing) prior to shipment. The cloth forming Shirt Lot 1 was objected to by the Government, and it was accepted only by a waiver of the shade. The cloth used in Shirt Lots 3 and 4 was shipped directly to plaintiff on or about March 25 and April 25, 1968, without a courtesy test. Sample swatches were not submitted to defendant until May 15, 1968. On May 27, 1968, plaintiff requested a waiver after rejections for shade failures, and at the same time proceeded to cut cloth and fabricate the shirts without awaiting a decision upon its request for waivers. This litigation would probably not have arisen if Sayles had obtained the required color approval prior to shipping the dyed cloth and if plaintiff had not been so hasty in putting the cloth into production. But now that the case is before us, we believe that the Board was correct in its interpretation that throughout this entire course of dealing, plaintiff was bound by the defendant's evaluation of color made according to defendant's standards.

Plaintiff contends that defendant is estopped from refusing to grant waivers for these shade failures because it had previously accepted material under shade waivers. It points to our decision favoring the contractor in L. W. Foster Sportswear Co. v. United States, 405 F.2d 1285, 186 Ct.Cl. 499 (1969) to support its assertion. That case granted an equitable adjustment for increased costs incurred as a result of defective Government specifications for certain goatskin flying jackets. They could have been produced individually without defects, but it was "commercially impracticable" to do so on a mass-production basis. Despite plaintiff's knowledge of this prior to entering into the contract, we allowed recovery because in *every* previous contract for the same product, the Government had allowed similar deviations from the specifications. Thus, it was reasonable for Foster to expect the same treatment in its next contract. 405 F.2d at 1289–1291, 186 Ct.Cl. at 506–509.

We do not believe that the *Foster* case is controlling here because of the following findings by the Board which are supported by substantial evidence. Rice v. United States, 428 F.2d 1311, 1314–1315, 192 Ct.Cl. 903, 909 (1970); Koppers Co. v. United States, 405 F.2d 554, 558, 559, 186 Ct.Cl. 142, 147–151 (1968). First, plaintiff knew at the time this contract was awarded on January 16, 1968, of only three waivers that had been granted for shade 2111 deficiencies. Second, defendant did not have any consistent practice of granting waivers in every case. Third, plaintiff was aware that waivers would not be granted when deficiencies affected serviceability or appearance. As stated above, Shirt Lots 3 and 4 were defective to a significantly greater degree than Shirt Lot 1 because the former lots' shade defects fell into Category 3. If, instead, they had been in Category 4, plaintiff might have a stronger argument. Even then, however, plaintiff would still be faced with the fact that the Government did not always grant waivers, and it warned plaintiff when it granted the waiver for Shirt Lot 1 that it "[did] not waive its rights to reject future quantities of supplies containing the same or other nonconformities * * *." We therefore agree with the Board that defendant was not estopped from refusing to grant waivers for Shirt Lots 3 and 4.

Plaintiff further argues that defendant waived its right to terminate the contract for default by waiting until January 2, 1969, to issue the default. It says that the case falls within the guideline of DeVito v. United States, 413 F.2d 1147, 188 Ct.Cl. 979 (1969):

The necessary elements of an election by the nondefaulting party to

waive default in delivery under a contract are (1) failure to terminate within a reasonable time after the default under circumstances indicating forbearance, and (2) reliance by the contractor on the failure to terminate and continued performance by him under the contract, with the Government's knowledge and implied or express consent. [413 F.2d at 1154, 188 Ct.Cl. at 990–991].

That case held that the Government had made a constructive election not to terminate where it allowed 48 days to elapse between the default and the termination and it accepted deliveries during that period. See also, Bailey Specialized Bldgs., Inc. v. United States, 404 F.2d 355, 186 Ct.Cl. 71 (1968).

 Here, the Government refused to accept the defective Shirt Lots 3 and 4 from the beginning. After the last date for delivery, November 11, 1968, had passed, 19,040 shirts due under the contract were undelivered. When the plaintiff did not respond to the contracting officer's ten-day ultimatum of November 27, 1968, the latter terminated the contract for default on January 2, 1969.

The Board found no evidence that plaintiff incurred any additional expense after the due date of the last delivery which was caused by the failure to terminate at an earlier date, and plaintiff has not shown any reason to doubt the Board's finding. In addition, there were no "circumstances indicating forbearance" by the Government in plaintiff's failure to deliver, and there was no "continued performance" by plaintiff as that term is used in DeVito. Indeed, plaintiff has completed its fabrication, albeit with defective material, many months earlier.

Plaintiff is not entitled to recover, and its motion for summary judgment is denied. Defendant's cross-motion for summary judgment is granted, and the petition is dismissed.