**BLUE CROSS AND BLUE SHIELD ASSOCIATION, Plaintiff,**

v.

**The UNITED STATES, Defendant.**

**No. 200–87C.**

United States Claims Court.

July 12, 1989.

Philip S. Neal, Washington, D.C., for plaintiff.

Catherine A. Christman, Washington, D.C., with whom was Acting Asst. Atty. Gen. Stuart Schiffer, and Susan Rogers, Office of Personnel Management, for defendant.

## OPINION

RADER, Judge.

The Blue Cross & Blue Shield Association (plaintiff or the Association), administers health plans in different geographical areas. The Association instituted this action on behalf of Blue Cross and Blue Shield of Atlanta, Georgia (BCBS). BCBS has a contract with the Office of Personnel Management (OPM)[1] to provide health in-

surance benefits to federal employees and retirees in Georgia.

The Association appeals from a decision of the Armed Services Board of Contract Appeals (Board or ASBCA). The Board determined that BCBS improperly charged its OPM contract for expenses attributed to a mandatory statutory reserve (MSR) required by Georgia state law.

The Board based its decision on a two-step analysis. First, the Board interpreted the MSR clause in the OPM contract to contain certain restrictions. Second, the Board found that BCBS failed to comply with those restrictions. Therefore, the Board reasoned, BCBS could not properly charge the contract for ordinary administrative expenses which BCBS considered MSR expenses.

This dispute arose over the legality of some uses of MSR funds. BCBS used MSR funds for salaries, cars, entertainment, and other ordinary administrative expenses. The Government insists that the contract only permits MSR funds to offset underwriting losses. Resolution of this question requires examination of the contract and a lengthy course of conduct between the parties. ASBCA reviewed this evidence and awarded judgment to the Government.

Plaintiff filed a summary judgment motion seeking reversal of the ASBCA decision. Plaintiff argues that the Board decision rests on erroneous conclusions of law. Plaintiff challenges the first step of the Board analysis. Plaintiff contends that the Board erroneously interpreted the contract as restricting use of MSR funds.

Defendant has filed a cross-motion for summary judgment. Defendant contends that the Board's decisions of fact and law rest on substantial evidence. After oral argument, this court denies plaintiff's motion and grants defendant's motion.

## FACTS

In 1960, the Association entered into a contract with the Government to provide

---

**1.** OPM is authorized to contract with insurance carriers to provide health benefit plans to federal employees. 5 U.S.C. § 8902(a) (1982). Until 1978, this authority was held by the Civil Service Commission.

health insurance for active and retired federal employees. The contract, CS 1039, covered one year and provided an annual renewal option for both parties. The parties have exercised that option each year since the contract's start.[2]

In 1960, the contract obligated the Government to pay a share of the expenses incurred by local participating plans to satisfy state MSR requirements. Article X of the contract provided for local plans to report MSR payments:

(c) Other charges composed of—

....

(iv) The amount necessary to satisfy mandatory statutory reserve requirements of participating plans to the extent that such requirements exceed that portion of the risk charge in (iii) above applicable to such plans. To the extent permissible, the applicable portion of such amount shall be held by the participating plan affected for the benefit of this contract.

From 1960 to 1968, the Government paid BCBS its share of MSR expenses without questioning the validity of state MSR standards.[3]

In January 1968, the Government first investigated the use of funds paid to offset MSR expenses.[4] On January 16, 1968, the General Accounting Office (GAO) wrote to Andrew Ruddock, Director, Bureau of Retirement and Insurance at the Civil Service Commission, to raise the possibility of modifying the contract to discontinue MSR payments. The GAO letter also questioned the disposition of MSR funds in the event state requirements changed or the contract ended:

We would also appreciate your views as to whether an amendment to the prime contract with the National Associations to provide for the return of contributions that have been previously paid by the FEP towards the local plans' statutory reserve requirements, either upon a reduction in the State's reserve requirements or, in any event, upon the termination of the contract with the National Associations would be unfair or would adversely affect the program operations.

*Blue Cross,* 85–2 B.C.A. at 90,117 (Finding No. 29).

Mr. Ruddock, in turn, asked Joseph E. Harvey, Vice President of Blue Cross & Blue Shield, to comment on the GAO letter. On March 26, 1968, Mr. Harvey responded:

The purpose of the reserve is, of course, to guarantee solvency of the Plan in the event of adverse underwriting experience irrespective of how or in what part of the Plan's business the adverse experience may occur.

....

Since these reserves are required by law and since amounts needed to build and maintain them must be acquired by the Plans from their total business for the benefit of their total business, it follows that sums paid to the Plans for this purpose belong to the Plans, subject only to the restrictions of state law. Thus the

---

2. When adopted in 1960, the parties could modify contract CS 1039 only by formal amendment:

No agent, person, organization or association has authority to change this contract or waive any of its provisions. No change in this contract shall be valid unless approved by duly authorized officers of the corporations and the Commission evidenced by amendment to this contract.

Contract CS 1039, Art. III(5) (1960). In 1961, the parties adopted an amendment providing that the parties could change the contract through a properly executed letter agreement. Currently, the parties may modify the contract either by formal amendment or by letter agreement.

3. During this same time period the Association "unilaterally reviewed State laws to determine which ones required, in its view, MSRs." *Blue Cross Ass'n & Blue Shield Ass'n,* 85–2 B.C.A. (CCH) ¶ 17,971 at 90,116 (Finding No. 28). Payments were then made to participating local plans (such as the Atlanta Plan) to satisfy state MSR laws. According to the ASBCA, the Government continued to make payments without inquiring into whether state MSRs complied with the contract's MSR clause.

4. During the years 1960 through 1967, OPM's predecessor did not audit BCBS's MSR payments. *Blue Cross,* 85–2 B.C.A. at 90,116 (Findings 26, 27). This failure to audit was due in part to the fact that there were only 6–8 auditors to perform audits of the entire Federal Employee Health Benefit Program.

Federal Government has no title to, interest in, or control over the use and disposition of these reserve funds.

*Id.* (Finding No. 30). Mr. Harvey's letter is silent about the use of MSR funds in the event that a state discontinues or reduces reserve requirements.

On February 25, 1970, in a letter to Mr. Ruddock, Mr. Harvey further explained plaintiff's view of the funds held by BCBS in its MSR:

[Use of the MSR] then depends upon the overall underwriting experience of the Plan rather than the experience of any single group or line of business. In the event of overall adverse underwriting experience, a local Plan will turn first to any unassigned surplus to cover the loss. If such funds are insufficient, the mandatory reserve is used (usually requiring the advance consent of the State Insurance Department). Use of these reserves relates in no way to the particular groups or lines of business that originally contributed them.

Blue Cross, *85–2 B.C.A.* at 90,119 (Finding No. 34).

Later, on February 22, 1974, Mr. Harvey discussed the types of underwriting losses that might trigger use of MSR funds:

The controlling aspect of this matter is the extent of the legal obligation of the involved Plans to set aside certain statutory reserves for protection of the financial solvency of the Plans in the event of extraordinary underwriting losses.

*Id.* at 90,120 (Finding No. 42).

From 1960 until December 1975, Blue Cross of Georgia/Atlanta, Inc. and Blue Shield of Atlanta, Inc., were separate, local plans in the Government-wide service benefit program. Although jointly managed, a different chapter of the Georgia Insurance Code governed each. Therefore, under the applicable Georgia law, Atlanta Blue Shield accumulated a contingency or epidemic reserve. GA Code Ann. § 56–1818.[5] The statute permitted Atlanta Blue Shield to stop accumulating funds whenever the reserve equaled the greater of $75,000.00 or 55% of annual premium income. In contrast, Atlanta Blue Cross was not subject to a state reserve requirement.

In December 1975, Atlanta Blue Shield merged into Atlanta Blue Cross. The surviving entity became BCBS. In April 1976, the Georgia legislature enacted legislation requiring BCBS to contribute to a subscriber's surplus. The Georgia Code provided "a health care corporation shall ... maintain a minimum subscriber's surplus of not less than $1,000,000...." GA Code Ann. § 56–1706a.[6]

Plaintiff charged the Government for a share of Georgia's subscriber surplus under the MSR clause of the contract. Subsequently, the Government determined that plaintiff's expenditures out of its subscriber surplus were not within the scope of the MSR clause. Plaintiff purchased, among other things, automobiles, travel, and entertainment out of the surplus. Therefore, the Government sought repayment of these funds.

BCBS refused to repay the Government. BCBS insisted that the MSR provision allowed plaintiff to use the funds "for the benefit of the contract." On this basis, plaintiff appealed to the contracting officer. On December 23, 1980, the contracting officer issued a two-part decision.

Both parts of the contracting officer's decision required BCBS to repay all MSR payments made by the Government pursuant to GA Code §§ 56–1818 and 56–1706a. The contracting officer also found the Georgia subscriber surplus was not an MSR as contemplated by the contract.

Plaintiff appealed the decision to the ASBCA under the disputes clause of the contract rather than under the Contract Disputes Act of 1978. The ASBCA overturned the first part of the contracting officer's decision, holding that the Government could not recover the MSR payments made from 1960 through 1971. Under the

---

5. The current version of Ga.Code Ann. § 56–1818 is found at Ga.Code Ann. § 33–18–23 (1982).

6. GA Code Ann. § 56–1706a is now found at GA Code Ann. § 33–20–13.

disputes clause of contract CS 1039, time barred this recovery. *Blue Cross,* 85–2 B.C.A. at 90,111–12. The ASBCA denied the appeal with respect to the second part of the decision. Accordingly, BCBS refunded payments made during 1976 and 1977 to the Government. *Id.* at 90,127. Based on the ASBCA decision, BCBS refunded $378,119.00, as well as a payment of $204,445.00 for lost interest income. These refunds, totaling $583,564.00, were paid to the special reserve of the federal employees program.

The Board based its decision to uphold the second part of the decision on several findings. First, the parties agreed by contract that BCBS could use the Government's contributions to MSR funds only for limited purposes. The parties' conduct evinced this agreement. Second, BCBS's expenditures for ordinary expenses did not comply with the limited uses of an MSR.

The linchpin of this reasoning was ASBCA's Finding No. 56 which discussed the limiting characteristics of an MSR. Finding No. 56 underlies ASBCA's conclusion that BCBS had not treated its funds like an MSR.

After considering the correspondence and testimony of the parties, the Board determined that the parties had agreed to six characteristics of an MSR:

    a. In case of an adverse overall underwriting experience, a local Plan would turn first to the unassigned reserves and if those funds were insufficient to cover the loss, the MSR would be used.

    b. Use of the MSR usually required the advance consent of the State Insurance Department.

    c. The MSR was to be a reserve intended to guard against unanticipated severe adverse underwriting experience with respect to a local Plan's business as a whole.

    d. Cost of the MSR would be levied uniformly against every group and every line of the Plan's business.

    e. The purpose of the MSR was to protect the Plan's solvency or financial viability in the event of unforeseen adverse underwriting experience.

    f. The MSR was made up of funds committed to a reserve for protection of the financial solvency of the plans in the event of extraordinary underwriting losses.

*Blue Cross,* 85–2 B.C.A. at 90,122 (Finding No. 56) (citations omitted).

The ASBCA made other important findings:

MSRs were described within appellant's [the Associations's] letter to respondent [Government] as having certain safeguards or characteristics (which respondent likewise urges were within the parties agreements) (Finding 56). Certain of these safeguards or characteristics were not observed by appellant, namely there was no distinction made in how the unassigned reserves and the funds paid to satisfy the requirement for a MSR were spent (Finding 53).

*Blue Cross,* 85–2 B.C.A. at 90,126. BCBS had spent MSR funds for ordinary business expenses, including employee salaries, cars, and entertainment. In essence, BCBS made no distinction between MSR funds set aside pursuant to Georgia Statute and BCBS's unassigned surplus funds. *Id.* at 90,122 (Finding No. 53). In view of BCBS's actions toward MSR funds, the Board decided that the funds set aside pursuant to GA Stat.Ann § 56–1818 and § 56–1706a were not MSRs as contemplated by the contract. The Board sustained the Government's recovery to "the extent not barred by limitations." *Id.* at 90,127.

On June 10, 1987, plaintiff filed a complaint in this court seeking review of that part of the ASBCA's final decision which sustained the contracting officer. Plaintiff argues that the 1960 contract provides a broad definition of MSRs. Further, plaintiff asserts that the parties have not amended the MSR clause. Therefore, plaintiff argues that Finding No. 56 is either not supported by substantial evidence or based on an erroneous conclusion of law.

The Government contends that plaintiff has attacked the Board's findings of fact by merely recasting them as conclusions of law. The Government also asserts plaintiff may not escape the finality of ASBCA find-

ings of fact by recharacterizing the arguments made before the Board. Further, defendant argues that substantial evidence in the record supports the ASBCA decision.

After discussing jurisdictional questions and setting forth the appropriate standard of review, this court must decide whether to uphold the ASBCA decision. This court must determine if the ASBCA correctly decided that the parties agreed by conduct to a limited definition of an MSR.

## DISCUSSION

The question faced by the court in this case is whether the decision of the ASBCA, which denied reimbursement for payments made to compensate for MSR charges for the years 1975 and 1976, will stand. This appeal was brought before the ASBCA under the disputes clause of the contract which is virtually identical to the Wunderlich Act, 41 U.S.C. §§ 321–322 (1982). Both parties agree that Wunderlich Act principles apply in this case.

### Jurisdiction

Defendant initially challenged plaintiff's jurisdiction before the Claims Court. Defendant questioned whether plaintiff's claim was for money presently due from the United States. Until 1989, the Association had held and administered Federal Employee Health Benefit Program (FEHBP) funds for the individual, local Blue Cross and Blue Shield plans. Therefore, defendant maintained, plaintiff actually sought permission to use money in its own possession. Accordingly, defendant asserted that the Claims Court lacked subject matter jurisdiction.

On January 1, 1989, new rules promulgated by OPM regarding monetary reserves became final. 53 Fed.Reg. 51,781 (Dec. 23, 1988). Under the new rules, health insurance carriers no longer hold FEHBP funds. The reserve funds are now held by the United States Treasury in Let-

ter of Credit accounts for each health insurance carrier. Plaintiff has begun drawing on the Letter of Credit account to reimburse local Blue Cross and Blue Shield plans for claims and other allowable charges.[7] Both parties agree that once plaintiff began drawing on the Letter of Credit account, the jurisdiction issue became moot. Plaintiff now seeks reimbursement from the Government.

The letter of credit arrangement changes the repository of FEHBP reserves from the Association to the United States Treasury. As a result of that change, the argument that FEHBP reserves are not in the Government's possession is no longer true; thus this court has jurisdiction pursuant to 28 U.S.C. § 1491(a)(1) (1982).

### Standard of Review

■ Plaintiff argues that the ASBCA decision was an interpretation of the contract and subject to *de novo* review as a conclusion of law. Defendant responds stating that plaintiff's challenges to the Board decision are merely recharacterizations of the fact findings, and such findings should be given judicial deference. The review of a Board decision does not permit reconsideration of the facts *de novo;* however, the Board's conclusions of law are not binding on this court. *Afro–Lecon, Inc. v. United States,* 820 F.2d 1198, 1201 (Fed.Cir.1987); *American Elec. Laboratories, Inc. v. United States,* 774 F.2d 1110, 1112 (Fed. Cir.1985); *Utley–James, Inc. v. United States,* 14 Cl.Ct. 804, 809 (1988); *see also* 41 U.S.C. §§ 321–322 (1982).

■ Interpretation of a contract under the Wunderlich Act is a question of law for this court to decide. *Blue Cross & Blue Shield Ass'n v. United States,* 13 Cl.Ct. 710, 712 (1987), 41 U.S.C. § 322. However, "factual determinations that form the basis of the Board's contract interpretation are entitled to finality if supported by substantial evidence." *Dale Ingram, Inc. v. Unit-*

---

**7.** In a joint statement filed January 9, 1989, the parties informed the court that there was a transition period for the Letter of Credit arrangement to become effective. Subsequently, at oral argument the parties agreed that the liquid assets held by Blue Cross and Blue Shield would be exhausted by late March 1989. At that point it became necessary to draw on the Letter of Credit account in the Treasury Department.

*ed States*, 201 Ct.Cl. 56, 71, 475 F.2d 1177, 1185 (1973); *see also Utley–James*, 14 Cl.Ct. at 808–09. Thus, the Claims Court must "determin[e] whether there is substantial evidence, *i.e.*, such evidence as might convince a reasonable person, to support the conclusion reached by the Board or agency." *Iconco v. United States*, 6 Cl.Ct. 149, 151 (1984), *aff'd*, 770 F.2d 179 (1985).

Accordingly, this court must first determine if the disputed portions of the Board's decision were findings of fact, or conclusions of law. If the Board's decision rests on fact-finding, this court must decide whether substantial evidence supports ASBCA's ultimate decision. *Blue Cross*, 13 Cl.Ct. at 712.

### ASBCA Findings

The Board's Finding No. 56, though relevant to the meaning of contract CS 1039, was a legitimate finding of fact, rather than a ruling of law. Beyond unrevelatory language about holding funds "for the benefit of this contract," the contract gives little guidance about the use of MSR funds. Therefore, the ASBCA had to resort to sifting parole evidence and the conduct of the parties to ascertain the meaning of the MSR clause. The United States Court of Appeals for the Federal Circuit states that when interpretation of a contractual provision rests on parole evidence, the issue becomes a question of fact rather than of law. *Beta Sys., Inc. v. United States*, 838 F.2d 1179, 1183 (Fed.Cir.1988); *see also* S. Williston, A Treatise of the Law of Contracts § 513–5 (4th ed. 1974); A. Corbin, Corbin on Contracts § 554 (1960).

The contract language did not define explicitly an MSR or the use of MSR funds. *85–2 B.C.A.* at 90,115 (Finding No. 21). Therefore, the Board appropriately analyzed the parties' conduct and communications regarding MSRs to interpret the contract. The Board appropriately engaged in fact-finding. Indeed the Board correctly labeled its conclusions as findings of fact.

■ A court, or in this case the Board, may inquire into a course of dealing when contract provisions are undefined. *L.W. Foster Sportswear Co. v. United States*, 186 Ct.Cl. 499, 509, 405 F.2d 1285, 1290 (1969); *Tibshraeny Bros. Constr., Inc. v. United States*, 6 Cl.Ct. 463, 470 (1984). The ASBCA opinion reveals that it correctly applied this type of analysis to discover the meaning of the term "MSR."

■ Having determined that the Board correctly engaged in fact-finding to ascertain the contract's meaning, this court must decide whether substantial evidence supports the ASBCA conclusions. The Board's decision rests on several key findings.[8] Substantial evidence supports each of the Board's findings. The key finding, however, is Finding No. 56. Finding No. 56 listed the six "essential characteristics" of a valid MSR. The Board heard much testimony that an MSR had these characteristics. For instance, Mr. Harvey stated that use of MSR funds usually required the advance permission of the state insurance commissioner. He also agreed the Georgia MSR "is necessary to provide for unforeseen contingencies and thus to minimize the chan[c]e of a company's insolvency." ASBCA Transcript of Proceedings, Nos.

---

**8.** The Board found that the Association had unilaterally reviewed individual state law requirements and made payments to satisfy local MSRs. *Blue Cross*, 85–2 B.C.A. at 90,116 (Finding No. 28). The Board based this finding on testimony by Mr. Ruddock for the Government and Mr. Harvey for the Association. Mr. Harvey testified that the "accounting and legal divisions of the national associations" determined which particular plans were eligible for MSR payments during "the earlier years of the program." ASBCA Transcript of Proceedings, Nos. 25777 and 25779, filed Jan. 15, 1988, Vol. II at 80 (ASBCA Tr.). Mr. Ruddock testified for the

defendant that the Government did not review state MSR requirements until 1968. ASBCA Tr. at 49.

The testimony by Mr. Harvey and Mr. Ruddock suggests the Association took it upon itself to determine which states deserved MSR payments. In doing so, the plaintiff applied its own definition of what constituted a valid MSR. Later, the Government challenged BCBS's concept of an MSR. According to the Government, BCBS could use MSR funds only to offset extreme underwriting losses. Plaintiff argued MSR funds were subject only to the restrictions of state law.

25777 and 25779, filed Jan. 15, 1988, Vol. II (ASBCA Tr.).

Michelle Johnson, Assistant Treasurer for BCBS testified that Georgia law required the accumulation of MSR funds "for contingencies and epidemics." ASBCA Tr., Vol. III, at 6. Ms. Johnson later testified the purpose of the MSR fund is to hold "an amount for contingencies and contingencies are whatever adverse experience was not anticipated." *Id.* at 48.

Plaintiff's insurance expert, John A. Sturgeon, testified the Georgia MSR "is for contingencies or epidemics." He also testified "contingencies" included unforeseen or unusual events including sudden excessive operating losses. *Id.* at 135–36.

Richard Pluschau, the Government's accounting expert, testified that MSR funds were intended for use in the event of an epidemic or shock loss. He defined this type of loss as "a catastrophic claims type of experience ... a big rash of claims to the health insurance provider as a result of this particular epidemic or particular shock...." ASBCA Tr., Vol. III, at 190.

Edwin R. Werner, the chief negotiator on behalf of Blue Shield Association in 1960, testified that one characteristic of MSR funds could be invaded only upon the authorization of the state insurance department. ASBCA Tr., Vol. V, at 16, 60–63. Mr. Werner further testified there was no specific discussion during the negotiations as to what would happen in the event that MSR requirements were reduced or eliminated by individual states. *Id.* at 17–18, 73.

This testimony from various witnesses contributed to the Board's finding that the MSR clause contemplated use of MSR funds to defray unexpected underwriting losses, not ordinary day-to-day administrative expenses. Thus, this testimony supported the Board's Finding No. 56.

Due to the importance of Finding No. 56, this court examined carefully ASBCA's evidence supporting the finding. The first of six MSR characteristics required local plans to exhaust unassigned reserves before using MSR funds in the case of an adverse overall underwriting experience.

Mr. Harvey's letter of February 25, 1970 shows plaintiff agreed with this element. Finding No. 56 merely restates the position taken by plaintiff in Mr. Harvey's letter.

The second characteristic of a valid MSR states that use of MSR funds usually required advance consent from the state insurance department. Mr. Harvey's letter corroborates his testimony before the Board that advance permission from the state insurance commissioner was usually required before expenditure of MSR funds. ASBCA Tr., Vol. II, at 97–98. Mr. Werner, from the Association's 1960 negotiating team, testified that the parties agreed that permission from state insurance commissions preceded use of MSR funds. ASBCA Tr., Vol. V, at 62–63.

The third characteristic provided that MSR funds guarded against unanticipated severe adverse underwriting experience. Testimony before the Board conflicted somewhat on this point. No witness suggested, however, that MSR funds could pay for daily business expenses. Plaintiff's witnesses testified that MSR funds provided for unforeseen contingencies including sudden excessive operating losses. Defendant's witnesses maintained that MSR funds protected against catastrophic claims experiences, such as epidemics or shock losses. The Board adopted a reasonable position: MSR funds were available for unanticipated severe adverse underwriting experiences. A local plan could use the funds to offset underwriting losses short of an epidemic or shock loss.

ASBCA's position was a reasonable middle ground. The Board did not go so far as to require an epidemic or shock loss before a plan could tap the MSR fund. Defendant advocated this position. Nor did the Board allow use of MSR funds for any unforeseen operating loss, as the plaintiff advocated. Instead, the Board required that the unforeseen losses be caused by a plan's underwriting experiences before the plan could use MSR funds.

Next, the Board found that the cost of maintaining an MSR would be levied uniformly against every group in a local plan.

This characteristic is supported by a letter from BCBS executive, Mr. Harvey. The Board's finding merely restates Mr. Harvey's written comments regarding uniform contributions by every group or line of a local plan's business. The Board, however, did not adopt Mr. Harvey's characterization of the funds as irretrievably commingled.

The fifth MSR characteristic stated the purpose of MSR funds, namely, to protect the local plan's viability in the event of an unforeseen adverse underwriting experience. This characteristic clarifies that MSRs protect the solvency of local plans. The Board stopped short of finding that MSR funds could be used for day-to-day expenses. Both this and the third characteristic require some type of unforseen adverse underwriting experience. Neither requires an epidemic or shock loss. The Board's findings show that neither plaintiff's nor defendant's evidence was totally persuasive on this point.

Finally, the Board found that MSR funds protected a plan's financial stability in the event of extraordinary underwriting losses. This finding was described by Mr. Harvey in his letter of February 22, 1974. Even though asserting that the Government had no interest in MSR funds, the plaintiff described the funds as usable only in the event of extraordinary underwriting losses.

Finding No. 56 resolves the primary dispute between the parties. A severe underwriting experience occurs when actual claims drastically exceed projected underwriting liabilities. Day-to-day operational losses do not qualify as severe underwriting losses. An MSR, according to the Board, cannot defray ordinary expenses such as salaries, cars, and entertainment.

In sum, letters exchanged by the parties and testimony before the Board substantiate the finding that a valid MSR had certain limiting characteristics. The Board heard testimony from eight witnesses during hearings over five days. The witnesses included Mr. Harvey (Blue Cross), and Mr. Ruddock (Government), who exchanged letters on behalf of the parties in the 1970's. Mr. Werner, who was a member of plaintiff's negotiating team in 1960 also testi-fied. The Board examined the contracts between the parties, and their communications by letter concerning MSRs. The Board also considered the parties' conduct regarding MSR funds.

The Board found that MSRs serve as a reserve against "unanticipated severe adverse underwriting experience." The Board also found that unassigned reserves would be used first to cover such a loss. After hearing testimony and reviewing exhibits, the ASBCA decided BCBS made no distinction in its use of funds set aside pursuant to the Georgia Statute. As trier of fact, the Board determined that a valid MSR had "certain essential characteristics" and the Georgia surplus fund did not satisfy those characteristics.

Consequently, ASBCA correctly determined that funds paid by the Government to BCBS "were not MSRs due to the manner in which [BCBS] managed and spent the funds." This determination passes muster under the tests of the Wunderlich Act.

Plaintiff contends that the 1960 contract does not say as a matter of law how funds are allocated if an MSR is reduced or eliminated. This court, therefore, examined the contract language. When interpreting a contract, this court must examine the contract as a whole, *Merando, Inc. v. United States*, 201 Ct.Cl. 28, 30, 475 F.2d 603, 605 (1973); *Raytheon v. United States*, 2 Cl.Ct. 763, 768 (1983), giving plain everyday meaning to the contract terms. *Thanet Corp. v. United States*, 219 Ct.Cl. 75, 82, 591 F.2d 629, 633 (1979); *Cherry Hill Sand & Gravel Co. v. United States*, 8 Cl.Ct. 757, 764 (1985).

Contract CS 1039 is a lengthy document of about 70 pages, including many subparts. Plaintiff alleges that the relevant parts of the contract remained "essentially unchanged" from the original 1960 version to the 1975 version which the parties agree is controlling. Transcript of Proceedings, No. 200–87C, filed Feb. 22, 1989, at 10.

During negotiations for the 1960 contract, the parties discussed New York's MSR provisions. Although "there was no agreement that any State reserve require-

ments must be essentially identical to the provisions of the New York statute," *Blue Cross Ass'n & Blue Shield Ass'n,* 85–2 B.C.A. (CCH) ¶ 17,971 at 90,115 (1985) (Finding No. 22), the New York statute served as a model for Article X(1)(C)(iv). The New York MSR law contained many of the limits on use of MSR funds found by ASBCA. This consideration of New York's MSR laws during negotiations leading to CS 1039 indicates that the parties reached some understanding about the scope of MSRs. The Board's examination of the conduct of the parties discloses the content of those understandings.

## CONCLUSION

Substantial evidence supports the ASBCA decision. The Board correctly examined parole evidence of the parties' intent and conduct to interpret the contract. The Board's findings and interpretation pass muster under Wunderlich Act standards.

Plaintiff has shown no basis on the record before this court to overturn ASBCA's finding "that § 56–1818 and § 56–1706(a)(4)—(5) were not MSRs due to the manner in which appellant managed, and supported by substantial evidence, spent the funds" during the years 1975 through 1977. Accordingly, this court grants defendant's motion for summary judgment and denies plaintiff's motion for summary judgment. The Clerk of the Court will enter judgment dismissing the complaint.

No costs.