**JANA, INC., Plaintiff–Appellee,**

v.

**The UNITED STATES, Defendant–Appellant.**

**No. 91–5012.**

United States Court of Appeals, Federal Circuit.

June 13, 1991.

Rehearing Denied July 9, 1991.

Suggestion for Rehearing In Banc Declined July 30, 1991.

Donald O. Ferguson, Gardner & Ferguson, Inc., San Antonio, Tex., argued, for plaintiff-appellee.

Donald E. Kinner, Atty., Commercial Litigation Branch, Dept. of Justice, of Washington, D.C., argued, for defendant-appellant. With him on the brief were Stuart M. Gerson, Asst. Atty. Gen., David M. Cohen, Director and Mary Mitchelson, Asst. Director.

Before RICH, MICHEL and PLAGER, Circuit Judges.

MICHEL, Circuit Judge.

The United States appeals the judgment of the United States Claims Court holding that JANA, Inc. did not overcharge the government on two contracts, and dismissing the government's counterclaim for repayment. *JANA, Inc. v. United States*, No. 650–87 C (Cl.Ct. Aug. 23, 1990). Because the Claims Court's construction of the contracts' records retention requirements was incorrect, and because it is uncontested that JANA could not produce records supporting the disputed billings as required by the contracts, we reverse and remand, directing entry of judgment for the government on its counterclaim.

## BACKGROUND

In October 1975, JANA was awarded two technical publication contracts with the United States Navy. These contracts were so-called "time and materials" contracts— that is, the contract price was to be determined largely by multiplying the number of employee hours billed by JANA against fixed hourly rates stated in the contracts. The final contract price was to be determined after the work was completed and, if the government so elected, an audit was performed.

JANA's work on the contracts was completed in late 1980, and the Navy made its last payment in early 1981. Over two years later, in July 1983, the Defense Contract Audit Agency (DCAA) began a routine audit of the contracts, at the request of the Navy. The audit showed large discrepancies between the number of hours for which JANA had billed, and been paid by, the government, and the number of hours actually worked, according to JANA's own time records. The DCAA issued audit reports for both contracts characterizing charges of $343,622 and $220,-164, for the unsubstantiated hours on each contract, as overpayments.

Based on the audit reports, the contracting officer issued a final decision in December 1986, finding that JANA had overcharged the government on the two contracts, and demanding repayment. Pursuant to the Contract Disputes Act, JANA contested the contracting officer's decision in the Claims Court. 41 U.S.C. § 609(a) (1988). The government counterclaimed for the alleged overpayments.

After denying cross-motions by the parties for summary judgment, the Claims Court tried the case and issued an oral bench ruling on August 10, 1990. The court found that the government had proven "beyond a reasonable doubt" that JANA could not produce records substantiating all the invoices it submitted to the government, but nevertheless found, in light of its construction of the contract provisions regarding JANA's duty to retain records, that the government had not proved that JANA had been overpaid. Bench Ruling, Joint Appendix (Jt.App.) at 5, 16. The court therefore entered judgment in favor of JANA. *JANA, Inc. v. United States*, No. 650–87 C (Cl.Ct. Aug. 23, 1990). The government appeals.

We have jurisdiction over the government's appeal pursuant to 28 U.S.C. § 1295(a)(3) (1988).

## DISCUSSION

### I

The discrepancy at issue in this case concerns the various types of documents used in JANA's method of recording and billing the time its employees worked on these two government contracts. Each JANA employee filled out "time cards," listing time worked on various jobs. The time each employee recorded for a given job—such as one of the contracts at issue here—was then transferred to a "labor recap sheet." The labor recap sheets for each of these contracts thus showed the time each employee spent working on just that contract during a given month. The time recorded on the labor recap sheets was then converted to a dollar value and recorded on the "job control register." Finally, the contents of the job control register were transferred to the "invoices" sent to the government for payment under each contract.

The DCAA audit of the two contracts at issue here detected that the labor recap sheets listed fewer hours than those reflected in labor costs on the job control register and billed to the government on invoices. In other words, the billings were not fully backed up by information from the labor recap sheets showing that the hours invoiced were actually worked.

It is undisputed, and indeed the trial court found "beyond a reasonable doubt," that neither at the time of trial, nor at the time of the audit, could JANA produce records substantiating all the charges it invoiced under the two contracts. The initial question we must consider is whether this entitles the government to repayment. To determine this, we must look to the interpretation of the contracts at issue.

Both of these time and materials contracts contain a "Submission of Invoices" clause, which provides that the contractor would only be paid for hours that can be substantiated:

> Invoice submissions for payment shall be made based on the *actual* hours worked.... *The contractor may be required to justify invoice billings as the Government reserves the right to audit* task efforts, employee time cards, etc. Such reviews will normally be conducted by the task ordering officer or, if requested by Naval Air Technical Services Facility, the Defense Contract Audit Agency.

Jt.App. at 98 (emphasis added in part). The contract itself thus put JANA on notice that no payments were final until the contracts had been audited, or the time for auditing had expired, and that at least until then, JANA could be required to produce records substantiating its invoices.

Both of the contracts also contained the "Audit by Department of Defense" clause required by the Armed Services Procurement Regulations (ASPR)[1] in effect at the time the contracts were awarded, providing:

> (a) *General.* The Contracting Officer or his representatives shall have the audit and inspection rights described in the applicable paragraphs ... below.

> (b) *Examination of Costs. If this is a* cost reimbursement type, incentive, *time and materials,* labor hour, or price redeterminable contract, or any combination thereof, *the Contractor shall maintain,* and the Contracting Officer or his representatives shall have the right to examine *books, records, documents, and other evidence and accounting procedures and practices, sufficient to reflect properly all direct and indirect costs of whatever nature claimed to have been incurred* and anticipated to be incurred for the performance of this contract.

\*　　\*　　\*　　\*　　\*　　\*

---

1. The ASPR were subsequently renamed the Defense Acquisition Regulations (DAR). In 1984, the DAR (along with other procurement regulations) were replaced with a general Federal Acquisition Regulation (FAR), codified at 48 C.F.R. §§ 1–53. The records retention provisions of the new FAR, 48 C.F.R. §§ 4.700–4.706 (1990), contain much language nearly identical to that in the ASPR. The ASPR and DAR continue to apply to contracts, such as the ones at issue here, which preceded the April 1, 1984 effective date of the FAR. *See* 32 C.F.R. Pts. 1–39, Vol. I at 10 (1989).

(e) *Availability.* The materials described in (b) ... above shall be made available at the office of the Contractor, at all reasonable times, for inspection, audit, or reproduction, *until the expiration of three years from the date of final payment under this contract or such lesser time specified in Appendix M....*

ASPR ¶ 7–104.41, codified at 32 C.F.R. Vol. II (1975) (emphasis added). These contract provisions explicitly require a contractor to retain records verifying the accuracy of invoices to the government. JANA was thus under a specific contractual duty to maintain records supporting the accuracy of its charges for the period specified.

■ The real issue in this case then is *how long* JANA was required to maintain the records that supported labor charges it invoiced. As specified in ASPR ¶ 7–104.41(e), quoted above, records normally must be maintained for three years unless a shorter period is specified in Appendix M to the ASPR. The government argues that the labor recap sheets are covered under subparagraph (i) of Appendix M–201.1, which provides a four year retention period for:

accounts receivable invoices, adjustments to the accounts, invoice registers, shipping orders, carrier freight bills, or *other documents which detail the material or services billed on the related invoices—* RETAIN 4 YEARS.

ASPR Appendix M–201.1(i), codified at 32 C.F.R. Vol. III (1975) (emphasis added).[2] The Claims Court, on the other hand, rejected the government's argument and held that the labor recap sheets were properly classified under subparagraph (vi), which imposes a retention period of only two years:

labor cost distribution cards *or equivalent documentation—*RETAIN 2 YEARS.

ASPR Appendix M–201.1(vi), codified at 32 C.F.R. Vol. III (1975) (emphasis added).[3] In either event, regardless of the applicable

period, the ASPR provide that the retention period "shall be calculated from the end of the contractor's fiscal year in which an entry is made charging or allocating a cost to a Government contract." ASPR Appendix M–101(b)(2). The last charges to the government under these contracts were in late 1980, and JANA's fiscal year ended March 31, 1981. Jt.App. at 6. The appropriate retention period is thus to be calculated from March 31, 1981.

The Claims Court ruled that the "all inclusive language" of M–201.1(i), "which in a generic sense could be describing every check written and every clock card or time record possibly related to the contract," did not include the labor recap sheets at issue in this case. Bench Ruling, Jt.App. at 10–11. Instead, focusing on another provision in the ASPR's records retention requirements, that records "are identified herein primarily in terms of their purpose or use and not by specific name or form number," ASPR Appendix M–101(b)(1), the court found that "there was nothing on the labor recap sheets and the totality of their universe that wasn't also on clock cards, time and attendance cards or employee time cards, whatever we call them, in their total universe," and that "the purpose or use of the labor summary or the labor recap sheet was the distribution of the time spent by employees in collecting it for all employees in one place." Jt.App. at 12. The court therefore reasoned that the labor recap sheets were more properly classified as "labor cost distribution cards or equivalent documentation" under ASPR Appendix M–201.1(vi), the retention period for which is only two years. Jt.App. at 12. The court therefore held that JANA was required to maintain the labor recap sheets only until March 31, 1983, and thus could "have destroyed all of these labor recap sheets, which [are] the only records causing any problem in this case three years [sic, months] before this audit began." *Id.*

---

**2.** The currently applicable FAR contains nearly identical language. *See* 48 C.F.R. § 4.705–1(a) (1990).

**3.** The FAR contains identical language. *See* 48 C.F.R. § 4.705–1(f) (1990).

We disagree with the Claim's Court's construction of the ASPR provisions incorporated into the contracts in this case.

It is undisputed—indeed, JANA's own president so testified—that the labor recap sheets do not contain the same information as the employee time cards: Whereas the time cards contain information as to a number of different contracts worked on by one employee for one day, the labor recap sheets collect information for only one delivery order, for one month, for one contract. Jt.App. 262–265. Looking at the documents, as the Claims Court sought to do, "primarily in terms of their purpose or use," ASPR Appendix M–101(b)(1), it is clear that the employee time cards maintained by JANA are "labor cost distribution cards" within the meaning of the ASPR, and that the labor recap sheets do *not* perform the same function as these "labor cost distribution cards" and therefore should not have been deemed "equivalent documentation" under ASPR Appendix M–201.1(vi). On the other hand, as the Claims Court acknowledged, labor recap sheets *do* fit within the literal terms of subparagraph (i), "documents which detail the material or services billed on the related invoices." ASPR Appendix M–201.1(i). Moreover, reading subparagraphs (i) and (vi) together suggests the logic behind the distinction between them: While a shorter retention period is imposed on voluminous records, like individual employee time cards, a longer period is required for records of a more summary nature, e.g., the labor recap sheets. We therefore hold that JANA's labor recap sheets are covered by the retention requirement of ASPR Appendix M–201.1(i).

Though the retention period for such materials is specified as four years, ASPR ¶ 7–401.41(e) states that the contractor shall retain records "until the expiration of three years from the date of final payment under this contract or such lesser time specified in Appendix M." *See also* ASPR Appendix M–201. The shorter time limit of three years thus applies. Calculating from the end of the fiscal year in which the last payment occurred, March 31, 1981, we hold that the contract thus required JANA to maintain the labor recap sheets and other documents supporting the invoices until March 31, 1984.

Properly interpreted, the contracts at issue here provided that payment would only be made for hours which were actually worked and which could be verified on audit. The contracts further required JANA to retain its records supporting its invoices, including labor recap sheets, through the time the DCAA audit was begun in July 1983. It is undisputed that JANA could not produce such records at the start of the audit. JANA is therefore liable to the government for overpayment. There being no factual issues in dispute, a remand for further proceedings is unnecessary, and judgment should be entered in favor of the United States for repayment of the overcharges assessed by the contracting officer.

II

■ JANA additionally argues, as it did before the Claims Court, that it is entitled to prevail on defenses of laches and estoppel, and that each defense is an alternative and sufficient basis for upholding the judgment of the Claims Court.

■ At the outset we note that it is not entirely clear whether the defense of laches may be asserted against the government. *See S.E.R., Jobs for Progress, Inc. v. United States*, 759 F.2d 1, 6–9 (Fed.Cir.1985) (discussing apparently conflicting authority in various circuits and in the Court of Claims, and concluding that "we do not think that the thrust of the decisions is that laches is always inapplicable *per se* in any contract or other claim where a legal rather than an equitable remedy is sought."). But even if laches is available in some situations as a defense against a government claim for repayment on a contract, this clearly is not such a case. The defense of laches requires a showing of two things: (1) unreasonable and unexcused delay by the claimant, and (2) prejudice to the other party, either economic prejudice or "defense prejudice"—impairment of the ability to mount a defense due to circumstances

such as loss of records, destruction of evidence, or witness unavailability. *See Cornetta v. United States*, 851 F.2d 1372, 1377–78 (Fed.Cir.1988) (considering, in banc, the scope of the laches defense, but where it was asserted *by* the government on a claim for military *back pay*, rather than, as here, against the government for repayment under a contract).

It is undisputed that the government had no knowledge of any overcharges by JANA, and thus no notice of the basis for its claim of overpayment, until the audit was concluded. That audit was begun within the period JANA was required to maintain records. Thus, assuming without deciding that laches could ever be asserted against the government in a contract case, it is clear that on these facts, the government's delay in conducting the audit, and the resulting delay in the issuance of a contracting officer's decision assessing the overcharges, were not unreasonable and inexcusable.

█ It is also not entirely clear whether the defense of estoppel is still available against the government in light of the Supreme Court's decision in *OPM v. Richmond*, —— U.S. ——, 110 S.Ct. 2465, 110 L.Ed.2d 387 (1990), which held that, absent fraud by the government, estoppel could never be asserted against it in suits to compel the payment of money from the public treasury in contravention of eligibility requirements contained in an Act of Congress. Public monies are unquestionably involved here, although statutory eligibility requirements are not.

In any event, even if our contract precedent prior to *Richmond* is still valid, it is clear that the requirements of estoppel were not shown here. That pre-*Richmond* precedent had held that when estoppel is asserted against the government in the context of a contract dispute, the necessary elements are: (1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contrac-

tor must rely on the government's conduct to his injury. *American Electronic Laboratories, Inc. v. United States*, 774 F.2d 1110, 1113 (Fed.Cir.1985); *Emeco Industries, Inc. v. United States*, 485 F.2d 652, 657, 202 Ct.Cl. 1006 (1973).

JANA argues that these requirements were met because it relied on the certifications by the contracting officer's technical representatives (COTR), at the time each invoice was sent, that the work requested was "satisfactorily performed" and did not expect an audit by DCAA. But it is undisputed that the COTR certifications pertained only to the quality of the work, not to whether the hours billed were correct. Jt.App. 258. And the trial court found, Bench Ruling, Jt.App. 15–16, and there has been no argument that this finding is clearly erroneous, that there was "no question" that the COTR certifications were "not in lieu of an audit." JANA, then, was not entitled to rely on the COTR certifications as verification that the number of hours invoiced were actually worked or that an audit would be foregone. Moreover, the contract itself clearly specified the government's option to audit, and the COTR certifications cannot amend the contract so as to cancel such right of audit. An audit could commence anytime during the period that the records to be audited were required to be kept. Thus, even assuming (without deciding) that estoppel may ever be asserted against the government to defeat its claim for repayment in a suit under the Contract Disputes Act, JANA has not established the requirements of an estoppel defense in this case.

Hence, without deciding whether in a contract case laches or estoppel could be asserted against the government on other facts, we hold that neither is established here. Although these defenses were properly raised below, the Claims Court did not decide them in its bench ruling. Our holding, however, is based entirely on straightforward application of law to undisputed facts and facts properly found, and thus remand for further findings by the Claims Court is not necessary.

## CONCLUSION

The judgment of the Claims Court was based on an erroneous interpretation of the records retention and audit provisions of the contracts at issue. Applying the properly found and undisputed facts to the properly interpreted contracts compels as a matter of law the conclusion that JANA is liable to the government for the overpayments as counterclaimed. Moreover, JANA's alternative defenses of laches and estoppel, even if available, were not established. Accordingly, the judgment of the Claims Court is reversed and the Claims Court is directed to enter judgment, on the plaintiff's claim and on the government's counterclaim, in favor of the United States.

*REVERSED AND REMANDED.*

## COSTS

Each party is to bear its own costs.