DATA COMPUTER CORPORATION OF AMERICA, Plaintiff,

v.

**The UNITED STATES, Defendant.**

**No. 00–637C.**

United States Court of Federal Claims.

Feb. 28, 2008.

---

Steven D. Cundra, with whom was Amy Epstein Gluck, Washington D.C., for plaintiff.

Michael N. O'Connell, United States Department of Justice, with whom were Peter D. Keisler, Assistant Attorney General, Jeanne E. Davidson, Director, and Brian M. Simkin, Assistant Director, Washington, D.C., for defendant.

## OPINION

BUSH, Judge.

This matter is before the court on plaintiff's motion for partial summary judgment

pursuant to Rule 56 of the Rules of the United States Court of Federal Claims (RCFC). At the heart of this lawsuit is a dispute over "final indirect cost rates applied to four Cost Plus Fixed Fee contracts" between plaintiff Data Computer Corporation of America (Data or DCCA) and the Health Care Financing Administration (HCFA) within the United States Department of Health and Human Services. Joint Preliminary Status Report of April 2, 2001 (JPSR). Plaintiff's motion has been fully briefed, and oral argument was neither requested by the parties, nor required by the court. Because the record before the court fails to show that Data is entitled to summary judgment on any of the issues brought forward in its moving brief, the court denies plaintiff's motion.[1]

## BACKGROUND

### I. Facts[2]

Data held numerous information technology Cost Plus Fixed Fee (CPFF) contracts with HCFA during the late 1980s and early 1990s. Compl. ¶ 1; Countercl. ¶ 2; Def.'s Facts ¶ 3. The contractor in such arrangements is allowed to charge the government for its indirect costs of performance at a rate described as the indirect cost rate, *i.e.*, a "percentage or dollar factor that expresses the ratio of indirect expense incurred in a given period to the direct labor cost, manufacturing cost, or another appropriate base

1. To the extent that plaintiff's reply brief could be considered to have brought forward new issues for the court to consider in its summary judgment analysis, those issues are waived because the government has had no opportunity to respond to them. *See Novosteel SA v. United States*, 284 F.3d 1261, 1274 (Fed.Cir.2002) ("Raising the issue for the first time in a reply brief does not suffice; reply briefs *reply* to arguments made in the response brief—they do not provide the moving party with a new opportunity to present yet another issue for the court's consideration.").

2. The court makes no findings of fact in this opinion. The facts recounted here are largely taken from defendant's answer, counterclaim and opposition to plaintiff's summary judgment motion, for two reasons. First, all doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States*, 812 F.2d 1387, 1390 (Fed.Cir.1987). Second, defendant's

for the same period." Def.'s Facts ¶ 7. The Federal Acquisition Regulation (FAR) provisions pertinent to the establishment of final indirect cost rates for Data's contracts in the 1987–1991 period, according to defendant, include 48 C.F.R. §§ 31.001, 31.203, 42.701, 42.703, 52.216–7 (1987). *See id.* ¶¶ 5–21. Of particular interest is FAR 42.703(a), which states that a single agency, in this case HCFA, is to be the indirect cost rate-setting agency, or "cognizant agency," for all of Data's contracts with federal agencies during this period.[3] *See id.* ¶¶ 21–22. It appears that Data held CPFF contracts with numerous federal agencies, in addition to HCFA. *See* Def.'s Facts ¶ 51; Pl.'s Reply at 12.

The parties have identified five CPFF contracts between Data and HCFA which are relevant to the subject matter. These contracts are identified by contract number:

500–87–0034

500–92–0019

500–92–0026

500–92–0003

500–93–0011

Def.'s Facts ¶ 3. The central digits of each contract number refer to the beginning fiscal year of the contract, such as 1987 or 1992, and the final two digits provide a useful shorthand reference, such as "the 34 con-

version of the facts directly and concisely addresses the legal issues which are relevant to the claims at issue in the subject matter.

> Plaintiff's complaint and summary judgment moving brief, on the other hand, are not organized in a manner which would aid the court's analysis. For example, none of plaintiff's three legal theories supporting its request for summary judgment are discernable in the complaint. Although the complaint might satisfy some bare minimum standard of notice pleading, it presents an unorganized series of factual allegations that almost perfectly hides the basis for its claim that the government has now issued two conflicting sets of indirect cost rates that apply to Data's work in the 1987–1991 period. This penchant for obfuscation is further indulged by the omission of tables of contents and authorities in plaintiff's moving brief, in violation of RCFC 5.3(a)(1)(A)-(B).

3. All further reference to the FAR is to the 1987 version.

tract" or "the 03 contract."[4] It is the final indirect cost rates of the 34 contract which are the focus of this summary judgment proceeding, because the parties dispute whether the indirect cost rates Data was allowed to charge on that contract, from 1987 through 1991, control or have some bearing on the correct rates applicable to all of Data's CPFF contracts with the government during that period (and perhaps in later years as well).

"During the course of performance of the [ ]34 contract, [Data] billed HCFA (and HCFA paid) for indirect cost expenses based upon a rate of 32 percent for fringe benefits and 78 percent for general and administrative ('G & A') expenses." Def.'s Facts ¶ 26. HCFA reviewed Data's billing justification and asserted, in March 1993, that Data owed HCFA approximately $838,000 for the 1987–1992 period. *Id.* ¶ 27. Data protested and in April 1993 suggested, rather, that HCFA owed Data $1.5 million. *Id.* ¶ 30; Def.'s App. at 34. It appears that neither HCFA nor Data was totally compliant with contract requirements regarding the monitoring or recording of indirect costs, and other allegations of improper actions were made by the parties. *See* Def.'s Facts ¶¶ 24–25, 28, 34–36, 41. Data represented to HCFA that it would go out of business if made to repay over $800,000 to HCFA. *Id.* ¶¶ 29, 39.

In a letter dated October 21, 1993, Data offered to settle the dispute over the 34 contract:

> In reference to our recent communication, [Data] is agreeable to settling all disputes and questions regarding HCFA Contract Number 500–87–0034 with no further cost to either party with the mutual understanding that this contract will be closed out and no future action taken in regards to costs or re[mun]eration by either party.

Def.'s App. at 61. This settlement offer was eventually accepted by HCFA as reflected in an internal memorandum dated February 14, 1994 (1994 memorandum). *Id.* at 62. Signed by three HCFA employees, including two contracting officers and a contract specialist, and titled "Settlement of [Data] claim under Contract 500–87–0034," the memorandum memorialized HCFA's decision to "close subject contract without further adjustment, as per [Data's] letter dated October 21, 1993." *Id.* Although it does not appear that the settlement between the parties was memorialized by a written settlement agreement, Data asserts that it was made aware of HCFA's decision to close the books on the 34 contract at no further cost to Data. Pl.'s Facts ¶¶ 13–14.

From 1995 through 1999, HCFA pursued communications with Data in an effort to set final indirect cost rates for 1987–1993, relevant to the 19, 26, 03, and 11 contracts. *See* Def.'s App. at 138–39; Def.'s Facts ¶¶ 62–80. Agreement was not reached, and on October 29, 1999, HCFA's contracting officer issued a final decision unilaterally setting Data's indirect cost rates for 1987–1993 and referencing the 19, 26, 03, and 11 contracts. Def.'s Facts ¶ 81. The rates set by the contracting officer's final decision resulted in a demand for payment, stating that Data owed HCFA $456,416.67, for fiscal years 1992, 1993 and 1994 for the 19, 26, 03, and 11 contracts. Def.'s App. at 231, 233. Plaintiff filed suit in this court on October 27, 2000, contesting certain aspects of the contracting officer's decision.

## II. Procedural History

### A. The Complaint

■ Plaintiff asserts that jurisdiction for its suit in this court exists under the Tucker Act, 28 U.S.C. § 1492(a)(1) (2000).[5] Compl. at 1. Plaintiff also hints at another source of

---

4. It is unclear whether fiscal year, rather than contract year or calendar year, is the span of time referenced in various parts of the record. The court adopts fiscal year (sometimes abbreviated as FY) as the generic reference because it is so identified in the contracting officer's decision contested by plaintiff in this suit. *See* Def.'s App. at 223. The distinction is immaterial to the court's disposition of plaintiff's motion.

5. Plaintiff also cites, inexplicably, to what is known as the Little Tucker Act, 28 U.S.C. § 1346(a)(2) (2000), which does not define the jurisdiction of this court, but that of United States District Courts.

jurisdiction: "jurisdiction is also proper in this Court pursuant to the [1999 contracting officer's] Final Decision." *Id.* at 2. The court assumes that plaintiff is indirectly referencing the Contract Disputes Act (CDA), 41 U.S.C. §§ 601–613 (2000), which permits a contractor to appeal a contracting officer's final decision to this court within twelve months, 41 U.S.C. § 609(a)(3). Plaintiff appears to be well aware that this suit is a CDA suit, because the complaint was filed within two days of the expiration of the CDA's twelve month limitations period. Furthermore, when the CDA applies to a contract, disputes related to a contracting officer's final decision may not be brought under any other grant of jurisdiction. *See* 41 U.S.C. § 605(b); *Tex. Health Choice, L.C. v. Office of Pers. Mgmt.*, 400 F.3d 895, 898 (Fed.Cir.2005) (" 'The CDA exclusively governs Government contracts and Government contract disputes.' " (quoting *Cecile Indus., Inc. v. Cheney*, 995 F.2d 1052, 1055 (Fed.Cir. 1993))). Therefore, despite any of plaintiff's allegations of jurisdiction to the contrary, plaintiff's suit challenging the October 29, 1999 final decision of the contracting officer for the 19, 26, 03, and 11 contracts is timely brought under the CDA.

In the complaint, plaintiff seeks "at least $22,127.63 in amounts not properly paid by HCFA under [the 19, 26, 03, and 11 contracts] for FYs 1992 through 1994." Compl. at 7. Plaintiff alleges that the 1999 final decision by the contracting officer set "incorrect" indirect cost rates for the four contracts in question, and resulted in underpayments to Data for fiscal years 1992 through 1994. *Id.* at 1. No overarching legal theory, or theories, are given as to why the indirect cost rates set by the 1999 decision are incorrect. Instead, plaintiff alleges that the contracting officer did not follow the FAR in allocating certain types of costs, *id.* ¶¶ 9–10, and should have allowed certain costs that were disallowed.

A reasonable reading of the complaint suggests that all of Data's legal arguments in support of its underpayment claim are line item disputes as to allowable costs. *See* Compl. ¶¶ 7–23. The supporting documentation attached to the complaint sets forth the calculations of the contracting officer, and alternative calculations presented by plaintiff, as to indirect cost rates and sums purportedly owed to Data (or to the government). *See id.* Exs. A–F. Buried within the complaint's list of factual allegations is one numbered sentence which discusses the close-out of "contracts" for fiscal years 1987–1991. *See id.* ¶ 4 ("HCFA previously closed out contracts for fiscal years 1987 to 1991 utilizing an HCFA approved billing rate of 78% as an Overhead Rate and 32% for a General and Administrative ('G & A') Costs Rate."). The significance of this factual allegation is not clarified, nor does plaintiff identify the "contracts" which are being referenced. None of the legal theories later brought forth by plaintiff in its summary judgment motion, relating to the contract close-out mentioned in paragraph four of the complaint, can be found within the four corners of the complaint.[6]

## B. The Counterclaim

Defendant responded to the complaint with its counterclaim for sums owed to HCFA by Data for the 19, 26, 03, and 11 contracts for fiscal years 1992 through 1994. *See* Compl. Ex. A at 11; Countercl. ¶¶ 2, 17. Defendant alleged jurisdiction for its counterclaim under the CDA and 28 U.S.C. §§ 1503, 2508 (2000). Jurisdiction does indeed lie under these statutes for the government's counterclaim against a CDA plaintiff. *Daff v. Unit-*

---

**6.** Defendant argues that plaintiff seeks summary judgment on an issue not raised in its complaint, pointing out that plaintiff's complaint does not appear to challenge the validity of the 1999 contracting officer decision on the basis of the 1994 memorandum closing out the 34 contract. Def.'s Opp. at 8. The court agrees that this issue is not presented in the complaint, although a bare mention of the close-out of "contracts" for 1987–1991 and the "HCFA approved" rates utilized in that close-out does, perhaps, offer a small hint of

a potential argument. The court is not persuaded, however, that authority in this circuit commands the denial of a summary judgment motion simply because it raises issues not present in the complaint, particularly in a suit where a counterclaim has subsequently been filed by the nonmovant. Because there is ample reason to deny plaintiff's motion on other grounds, the court will not rely on defendant's argument related to procedural flaws in plaintiff's motion practice.

*ed States,* 78 F.3d 1566, 1573 (Fed.Cir.1996). In defendant's counterclaim, defendant provides a chronology describing the steps HCFA took to negotiate a final indirect cost rates for 1987–1993, the failure of those negotiations, and citing a FAR provision as authority for the contracting officer to unilaterally set the indirect cost rates for those years. Countercl. ¶¶ 7–16. Thus, defendant provided both the operative facts and the legal basis for its counterclaim.

## C. The Motion for Partial Summary Judgment

Plaintiff has now moved for summary judgment, not on its own claim for approximately $22,000, but on an issue which, if determined in its favor, would presumably affect defendant's much larger counterclaim.[7] "Plaintiff seeks Summary Judgment on the Indirect Cost Rates for the Calendar Years ('CY') 1987 through 1991 (fiscal years ending December 31, 1987 through December 31, 1991) as having been previously decided by the Government in this case." Pl.'s Mot. at 1. Plaintiff further describes the scope of its summary judgment motion in a footnote:

> This lawsuit challenged the indirect cost rates established in a unilateral "Final Decision" issued on October 29, 1999 for CYs 1987 through 1994. [Data] settled the rates for FY 1994 after this lawsuit was filed. This Motion addresses CYs 1987 through 1991 only. The rates for CYs 1992 and 1993 are not the subject of this Motion and remain at issue and contested in this action. The rates for CYs 1992 and 1993 raise different issues and may be the subject of a separate and later motion for summary judgment.

*Id.* at 1 n. 1. The court, in the interest of clarity, will attempt to decode and paraphrase plaintiff's statement of the issues before it.

First, the court notes that a settlement has been reached as to fiscal year 1994, at least according to plaintiff. Pl.'s Mot. at 1 n. 1; *id.* at 4 n. 2. Indeed, FY 1994 has not been

mentioned as a live issue in this case for some time. *See* Def.'s Enlargement Mot. of Aug. 10, 2007 at 2; Pl.'s Resp. of Aug. 22, 2007 at 1. Whether plaintiff has abandoned its claim for FY 1994, which was estimated to be a credit of $6,491.63 owed to the government, Compl. ¶ 33, and defendant has abandoned its claim for FY 1994, the sum of approximately $5,845.80 it claimed Data owed to the government, *id.* Ex. A at 11, is a question the court leaves for another day.

As to plaintiff's characterization of the complaint's "challenge" to the 1999 final decision of the contracting officer, Pl.'s Mot. at 1 n. 1, it is true that plaintiff asserted that the indirect cost rates for 1987–1993 in the final decision were "incorrect," Compl. at 1. All of the money claims in the complaint, and in the counterclaim, for that matter, focus, however, on the rates for fiscal years 1992, 1993 and 1994. Thus, whether the complaint truly challenged the rates for 1987–1991 is debatable. *See* Def.'s Opp. at 8 ("[Data] did not ask the Court to declare invalid or set aside the contacting officer's determination of indirect cost rates for 1987 to 1991."). In any event, there appears to be at least some connection between the rates for the earlier years, and the rates for fiscal years 1992–1994, established in the 1999 final decision. *See, e.g.,* Compl. Ex. A at 12 n. 1. Therefore, the court concludes that plaintiff has raised the issue of the validity of the 1987–1991 indirect cost rates set by the October 29, 1999 final decision, and that this issue is properly before the court. Defendant has not cross-moved on this issue.

Plaintiff relies first and foremost on a factual allegation in support of its view that the 1987–1991 rates set forth in the 1999 decision were invalid. Plaintiff argues that in the 1994 memorandum, "final indirect cost rates [were] established by three Government Contracting Officers ..., [and these rates] govern[ed] all of [Data's] federal contracts for CYs 1987 through 1991." Pl.'s Mot. at 5. This factual allegation is disputed by defendant. Plaintiff further argues that adminis-

---

7. According to the government, much more is at stake in this motion than just the counterclaim in this case: "If the Court grants [Data's] motion, [Data] will avoid any repayment of its overbill-ings [to various government agencies over a sixteen to twenty year period totaling at least two million dollars]." Def.'s Opp. at 2.

trative *res judicata,* equitable estoppel and waiver principles prevent the government from establishing rates in 1999 for the 1987–1991 period. *See id.* at 7–14. The court must necessarily focus not on whether plaintiff or defendant has the more plausible assessment of the validity of the indirect cost rates for 1987–1991 set by the contracting officer's final decision in 1999, but on whether summary judgment can be granted setting aside these rates based on the record before the court.

## DISCUSSION

### I. Summary Judgment

Pursuant to RCFC 56, summary judgment should be granted when "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." RCFC 56(c). In considering a motion for summary judgment, the court does not "weigh[ ]" each side's evidence. *Contessa Food Prods., Inc. v. Conagra, Inc.,* 282 F.3d 1370, 1376 (Fed.Cir.2002) (citing *Avia Group Int'l, Inc. v. L.A. Gear Cal., Inc.,* 853 F.2d 1557, 1565 (Fed.Cir.1988)). Rather, "the court views the evidence and any disputed factual issues in the light most favorable to the party opposing the motion." *Enzo Biochem, Inc. v. Gen–Probe Inc.,* 285 F.3d 1013, 1017 (Fed.Cir.) (citation omitted), *vacated on other grounds by* 323 F.3d 956 (Fed.Cir.2002). That is, all doubt over factual issues must be resolved in favor of the party opposing summary judgment. *Mingus Constructors, Inc. v. United States,* 812 F.2d 1387, 1390 (Fed.Cir.1987). "The movant bears the burden of demonstrating absence of all genuine issues of material fact...." *SRI Int'l v. Matsushita Elec. Corp. of Am.,* 775 F.2d 1107, 1116 (Fed.Cir.1985) (en banc) (citing *Cooper v. Ford Motor Co.,* 748 F.2d 677, 679 (Fed.Cir.1984)).

### II. Analysis

Plaintiff seeks summary judgment on the grounds that the 1987 through 1991 indirect cost rates set forth in the 1999 final decision are invalid. Plaintiff maintains that the indirect cost rates for 1987 through 1991 were made and memorialized in writing by "three HCFA contracting officers" in the February 14, 1994 memorandum. Pl.'s Mot. at 7. However, defendant has raised a genuine issue of material fact as to whether the 1994 memorandum actually established the final indirect cost rates for 1987 through 1991 for all of Data's contracts with the government.

Plaintiff argues that, on March 9, 1994, that HCFA contracting officers established the final indirect cost rates for years 1987 through 1991. *Id.* Plaintiff asserts that the final indirect cost rates established in the 1994 memorandum were intended "to govern all of DCCA's federal contracts for CYs 1987 through 1991." *Id.* at 5. Defendant, on the other hand, argues that the purpose of the 1994 memorandum was to reflect a settlement resolving the contractual disputes surrounding the 34 contract. Def.'s Opp. at 9–10. It was not meant to establish the final indirect cost rates for Data's contracts with other agencies. Defendant describes the 1994 memorandum as follows:

> On October 21, 1993, DCCA offered to settle the dispute with no money changing hands between HCFA and DCCA. DCCA's October 21, 1993 offer said nothing about the establishment of indirect cost rates for contracts with other agencies. *HCFA's February 1994 memorandum reflected the contracting officers['] decision to accept DCCA's offer to forego its own claim if HCFA dropped its claim for overpayment of indirect costs. This memorandum does not discuss or imply any intent by the contracting officers to bind other agencies to indirect cost rates that did not correspond to DCCA's actual costs from 1987 to 1991.*

Def.'s Opp. at 9–10 (emphasis added and citations omitted).

The February 14, 1994 memorandum, while not a written settlement agreement, is the primary document cited in this litigation that goes to the issue of whether the government, in 1994, established final indirect cost rates for the years 1987 through 1991. However, there are genuine issues of material fact with respect to the 1994 memorandum as to whether the HCFA contracting officers intended to set final indirect cost rates for

the 1987–1991 period that would bind other government agencies, and whether the HCFA contracting officers actually established final indirect cost rates for the 1987–1991 period. Thus, genuine issues of material fact exist as to whether the 1994 memorandum set final indirect cost rates for Data's contracts.

Plaintiff also argues that the principles of *res judicata*, equitable estoppel, and waiver prevent the government from retroactively changing the indirect cost rates in its 1999 final decision. However, the court finds that granting summary judgment on any one of these grounds would first require a determination that the 1994 memorandum actually established the indirect cost rates for 1987 through 1991. As previously stated, the answer to this issue is uncertain, creating a dispute of material fact that prevents the entry of summary judgment for plaintiff in the first instance. Nonetheless, the court will address each of plaintiff's arguments.

### A. Administrative *Res Judicata*

Plaintiff asserts that the 1994 memorandum issued by the HCFA contracting officers precludes "the government from seeking to impose different rates five and one-half years later under the doctrine of *res judicata*." Pl.'s Mot. at 7. Data asserts that "it is undisputed in this case that, on March 9, 1994, three HCFA Contracting Officers (including Mr. Hebbel) memorialized, in writing, their decision to establish the final indirect cost rates for DCCA for CYs 1987 through 1991.... It is also undisputed that this decision was carried out by HCFA and that HCFA formally closed the subject DCCA contract on May 11, 1994 utilizing the approved contract billing rate of 78 percent (78%) as an Overhead Rate and 32 percent (32%) for a G & A Rate for CYs 1987 though 1991." *Id.* at 8.

Data contends that the 1994 memorandum meets all three conditions for the application of administrative *res judicata* because: (1) the 1994 written decision involved the same party, Data; (2) the 1994 written decision was "based on the same facts and on the same issues—whether HCFA could retroactively re-adjust or reduce DCCA's indirect

cost rates for CYs 1987–1991 as recommended by HCFA cost analyst Jerry Gross and later memorialized in a series of reports issued by him on June 8, 1993;" and finally, (3) the 1994 written decision "became final when HCFA formally closed the subject DCCA contract on May 11, 1994, utilizing the approved contract billing rate of 78 percent (78%) as an Overhead Rate and 32 percent (32%) for a G & A Rate for CYs 1987 through 1991." Pl.'s Mot. at 8–9. Thus, Data concludes that it is entitled to summary judgment as a matter of law under the doctrine of administrative *res judicata*.

Under the doctrine of *res judicata*, "[a] final judgment on the merits of an action" prevents a party from relitigating an issue or claim that was or could have been raised in the previous action. *Ammex, Inc. v. United States*, 334 F.3d 1052, 1055 (Fed.Cir.2003) (quoting *Federated Dep't Stores, Inc. v. Moitie*, 452 U.S. 394, 398, 101 S.Ct. 2424, 69 L.Ed.2d 103 (1981)). The United States Court of Appeals for the Federal Circuit has expanded that definition of *res judicata* to embrace "two preclusion concepts:" "issue preclusion" and "claim preclusion." *Carson v. Dep't of Energy*, 398 F.3d 1369, 1375 (Fed. Cir.2005) (quoting *Migra v. Warren City Sch. Dist. Bd. of Ed.*, 465 U.S. 75, 77 n. 1, 104 S.Ct. 892, 79 L.Ed.2d 56 (1984)). "[I]ssue preclusion ... only bars matters actually litigated in a prior proceeding." *Id.* at 1375 n. 8. "[C]laim preclusion forecloses matters that, although never litigated or even raised, could have been advanced in an earlier suit." *Id.*

■ The doctrine of *res judicata* is not limited to judicial actions; it has also been extended to administrative agency actions that have issued final determinations. "Res judicata is not invoked solely as a result of prior judicial decisions; when an administrative agency acts in a judicial capacity, permitting the parties to fully litigate their claims, its final determination is also accorded res judicata effect." *Phillips/May Corp. v. United States*, 76 Fed.Cl. 671, 675 (2007) (citations omitted).

In order for a party to prevail on a claim of *res judicata*, the party must prove that: "(1)

the parties are identical or in privity; (2) the first suit proceeded to a final judgment on the merits; and (3) the second claim is based on the same set of transactional facts as the first." *Ammex, Inc.*, 334 F.3d at 1052 (citations omitted).

■ In the instant case, Data cannot prevail on the doctrine of *res judicata*. Fundamental to a claim of *res judicata* in an administrative context are the requirements that the administrative agency was acting in a "judicial capacity" and that the parties had an "opportunity to litigate" their claims. *See Astoria Fed. Sav. & Loan Ass'n v. Solimino*, 501 U.S. 104, 107, 111 S.Ct. 2166, 115 L.Ed.2d 96 (1991). Plaintiff has not satisfied either requirement. Plaintiff has not demonstrated, through case law or facts, that the HCFA contracting officers in 1994 were acting in a judicial capacity when they made their decision in February 1994. Nor has Data shown that there was an adversarial proceeding between HCFA and Data that resulted in the issuance of the 1994 memorandum. *See Roxco, Ltd. v. United States*, 60 Fed.Cl. 39, 45 (2004) (holding that *res judicata* does not apply where the contracting officer "did not act in a judicial capacity and there was no adversarial proceeding between the Government and Roxco"). For these reasons, the court finds that the doctrine of *res judicata* was inapplicable in this instance and did not prevent the contracting officer from establishing indirect cost rates in the 1999 decision.

Plaintiff's *res judicata* argument also fails because defendant has demonstrated that there is a dispute of material fact concerning the 1994 memorandum. Plaintiff claims that the 1994 memorandum set the final indirect cost rates for 1987–1991 and that these rates were binding on other agencies. Pl.'s Mot. at 7. The government contends that the 1994 memorandum only resolved the pending claims surrounding the 34 contract and that it was not meant to establish indirect cost rates for other contracts or agencies:

> HCFA had paid DCCA using the interim billing rates of 32 percent for fringe benefits and 78 percent for G & A. By closing the contract without making monetary adjustment, HCFA, in effect, left these rates

in place for its own contract. However, there is nothing in the record before the Court that supports DCCA's argument that HCFA intended to establish final indirect cost rates, binding upon other agencies, of 32 percent for fringe benefits and 78 percent for G & A, or the rates of 78 percent for overhead and 32 percent for G & A which are mistakenly set forth in the February 14, 1994 memorandum.

Def.'s Opp. at 10.

Based on this genuine issue of material fact, the court finds that it cannot grant summary judgment for plaintiff on *res judicata* grounds.

### B. Equitable Estoppel

Plaintiff claims that HCFA should be "equitably estopped from attempting to impose any other indirect rates on the contract at issue other than the final indirect cost rates established by three Government Contracting Officers in 1994, as memorialized in Mr. Simmons' February 14, 1994 Memorandum, with the written concurrence of Contracting Officers Marian Webb and Brian Hebbel on March 9, 1994: 78% Overhead and 32% G & A." Pl.'s Mot. at 9. Data wants the court to impose the indirect cost rates set forth in the February 14, 1994 memorandum as the final indirect cost rates for the years 1987 through 1991, and thus estop the government from using the indirect cost rates in the 1999 decision as the final indirect cost rates.

"Estoppel is an equitable doctrine invoked to avoid injustice in particular cases." *Heckler v. Cmty. Health Servs. of Crawford County, Inc.*, 467 U.S. 51, 59, 104 S.Ct. 2218, 81 L.Ed.2d 42 (1984). To prevail on a claim of equitable estoppel, a plaintiff must show that he "relied on its adversary's conduct 'in such a manner as to change his position for the worse' and that reliance must have been reasonable in that the party claiming the estoppel did not know nor should it have known that its adversary's conduct was misleading." *Id.* (citation and footnotes omitted). While the Supreme Court has not firmly established whether equitable estoppel is available against the government, the Court has stated that "it is well settled that

the Government may not be estopped on the same terms as any other litigant." *Id.* at 60, 104 S.Ct. 2218. Therefore, a party seeking to assert the defense of estoppel against the government has "an extraordinary high burden and must, at a minimum, show 'affirmative misconduct.'" *Wertz v. United States,* 51 Fed.Cl. 443, 450 (2002) (citing *Henry v. United States,* 870 F.2d 634, 637 (Fed.Cir. 1989)).

Although the Supreme Court has not held in definite terms that affirmative misconduct is necessary to invoke the defense of equitable estoppel, the United States Court of Appeals for the Federal Circuit has done so:

> In particular, the Court has suggested that if equitable estoppel is available at all against the government some form of affirmative misconduct must be shown in addition to the traditional requirements of estoppel. While the Supreme Court has not squarely held that affirmative misconduct is a prerequisite for invoking equitable estoppel against the government, this court has done so, as has every other court of appeals.

*Zacharin v. United States,* 213 F.3d 1366, 1371 (Fed.Cir.2000) (citations omitted).

█ In addition to establishing affirmative misconduct, a plaintiff invoking the doctrine of equitable estoppel in the context of a contract dispute must prove the following elements: "(1) the government must know the true facts; (2) the government must intend that its conduct be acted on or must so act that the contractor asserting the estoppel has a right to believe it so intended; (3) the contractor must be ignorant of the true facts; and (4) the contractor must rely on the government's conduct to his injury." *JANA, Inc. v. United States,* 936 F.2d 1265, 1270 (Fed.Cir.1991) (citations omitted).

█ In the instant case, Data's attempt to invoke the doctrine of equitable estoppel fails because plaintiff has not satisfied the second and fourth prongs of the equitable estoppel test relating to the government's intent and Data's reliance. The record does not support plaintiff's contention that the government intended Data to rely on indirect cost rates allegedly established in the 1994 memorandum as the final indirect cost rates for the years 1987 through 1991. Viewing the facts in the light most favorable to defendant, the events described below transpired.

The record shows that the 1994 memorandum entitled "Settlement of [Data] claim under Contract 500–87–0034" simply reflected a settlement resolving the pending contractual disputes surrounding the 34 contract. Def.'s Opp. at 9–11. The 1994 memorandum was developed as a result of Data's October 21, 1993 letter to HCFA which offered that both Data and HCFA should settle "all disputes and questions regarding HCFA Contract Number 500–87–0034 with no further cost to either party with the mutual understanding that this contract will be closed out and no future action taken in regards to costs or remuneration by either party." Def.'s Opp. at 21; Def.'s App. at 62. The 1994 memorandum reflected Data's settlement offer, and closed out the 34 contract "as per DCCA's letter dated October 21, 1993." Def.'s App. at 62. Neither Data's letter of October 21st nor the 1994 memorandum made any reference to the fact that the closing out of contract 34 would establish final indirect cost rates for any federal agencies for the years 1987 to 1991.

Joseph Simmons, the contract specialist involved in the closing out of contract 34, testified in his deposition of September 18, 2007 that:

> The fact that we settled under 500–87–0034, that we settled and those were the rates that were in that contract, does not mean we are settling or we are setting final indirect cost rates for all Government agencies. That would only be done if we had written an indirect cost agreement and stated therein that it was applicable to all Federal agencies.

Pl.'s Reply Ex. A (Deposition of Joseph Simmons, Tr. at 130). The contracting officer, Brian Hebbel, in his September 2007 declaration, echoed Mr. Simmons' testimony:

> 6. HCFA did not wish to drive DCCA out of business. DCCA also told us that their records had been destroyed in a flood. We decided to accept DCCA's offer and thereafter closed out the 500–87–0034 contract. On March 9,

1994, I signed as a concurring in the decision a memorandum written by Mr. Simmons, dated February 14, 1994, closing out the contract.

7. Mr. Hutchens never stated that DCCA expected HCFA to establish final indirect rates for other agencies at the interim billing rates for the 500–87–0034 contract. Nor did I intend to do so by my concurrence with the February 14, 1994 memorandum.

Def.'s App (Declaration of Brian Hebbel ¶¶ 6–7). Based on the record before the court, plaintiff's argument that the 1994 memorandum was intended to or did establish final indirect cost rates at 32% for fringe benefits and 78% for G & A for all government agencies contracting with Data is both uncertain and unpersuasive.

Furthermore, Data's post–1994 actions are indicative that plaintiff did not rely on the 1994 memorandum as establishing the final indirect cost rates for the years 1987 through 1991. The record shows that on several occasions the parties exchanged letters in efforts to establish final indirect cost rates for the remaining contracts between Data and HCFA for the years 1987–1993. *See* Def.'s App. at 138–39; Def.'s Facts ¶¶ 62–80. For example, on April 27, 1995, HCFA wrote to David Bower, president of Data, requesting the final and provisional indirect cost rates for the years 1990 to 1994. Def.'s Opp. at 12; Def.'s App. at 138; Def.'s Facts ¶ 63.

Data responded to HCFA's requests and provided HCFA with Data's own proposals of final indirect cost rates. On January 7, 1998, Data wrote to HCFA, "appealing to [HCFA] to adjust the Indirect Rates for the years 1989 through 1992, as we feel that these rates were incorrectly established by the HCFA auditor." Def.'s Opp. at 13; Def.'s App. at 180–81; Def.'s Facts ¶¶ 72–73. In its letter, Data proposed a new set of indirect cost rates for the years 1989 to 1992. On February 10, 1998, Data sent a memorandum to HCFA, proposing additional indirect cost rates for the years 1987 through 1993. Both Data and HCFA continued to negotiate final indirect cost rates through the remainder of 1998 and into 1999. Def.'s Facts ¶ 80.

Defendant asserts that these facts demonstrate that Data did not rely on the 1994 memorandum as setting forth the final indirect cost rates for the years 1987 through 1991. Def.'s Opp. at 13. The court agrees. The correspondence exchanged between Data and HCFA indicates that plaintiff was aware that final indirect cost rates still needed to be finalized for the remaining contracts between Data and HCFA. *Id.* Thus, Data's argument for equitable estoppel fails because Data has not established the second and fourth prongs of the equitable estoppel test set forth above.

Data's claim of equitable estoppel also fails because plaintiff has not alleged facts sufficient to establish some form of affirmative misconduct by the government. *See DeMarco Durzo Dev. Co. v. United States,* 60 Fed. Cl. 632, 638 (2004) (holding that plaintiff failed to plead facts sufficient to allege affirmative misconduct on the part of the government); *Wertz,* 51 Fed.Cl. at 450 (holding that "[p]laintiff alleges no facts indicative of misrepresentation, much less affirmative misconduct by the IRS"). There is no evidence in the record that the government misled Data into believing that the 1994 memorandum would establish final indirect cost rates for the years 1987–1991. There is no evidence that any of the contracting officers made a single misrepresentation to Data that the closing out of contract 34 would set the final indirect cost rates for other agencies for the years 1987–1991. Furthermore, Data's reliance on the 1994 memorandum is wholly unavailing inasmuch as Data's own actions fail to support its contentions in this regard. Data, by its October 21, 1993 letter, offered to settle and close out the 34 contract. In that October 21, 1993 letter, Data never made any request or suggestion that the 1994 memorandum would establish final indirect cost rates for HCFA or other agencies. For these reasons, the court is unpersuaded that the government misled Data in any manner.

Finally, as previously discussed, the government cannot be estopped from imposing final indirect cost rates in 1999 because there exists a genuine issue of material fact as to whether the 1994 memorandum established

the final indirect cost rates for 1987 through 1991. The court finds that Data is not entitled to summary judgment on estoppel grounds.

## C. Waiver

■ Data argues that "HCFA's failure to follow its own contract requirements that HCFA audit and adjust the indirect cost rates, if warranted, within ninety (90) days of the contract award, despite their stated intent to do so, waived the Government's right to retroactively readjust DCCA's indirect cost rates for 1987–1991." Pl.'s Mot. at 12. Data further argues that the government closed out the 34 contract because it "concluded in 1994 that DCCA should not be punished for the Government's 'mistake' of failing to follow the contract award with a timely audit and adjustment of the indirect cost rates, if warranted." *Id.* at 13.

In order for a waiver to be effective, "it must be clearly established that there was 'an intentional relinquishment or abandonment of a known right or privilege.' " *Am. Airlines, Inc. v. United States,* 77 Fed.Cl. 672, 681 (2007) (quoting *Brookhart v. Janis,* 384 U.S. 1, 4, 86 S.Ct. 1245, 16 L.Ed.2d 314 (1966)). "The waiver must be a 'voluntary, knowing and intelligent act[ ] done with sufficient awareness of the relevant circumstances and likely consequences.' " *Id.* (quoting *Youngdale & Sons Constr. Co. v. United States,* 22 Cl.Ct. 345, 346–47 (1991)). A waiver does not need to be express, "but may be inferred from a pattern of conduct." *Id.*

Data has not shown through affidavits, exhibits, or other evidence that defendant waived its right to retroactively readjust indirect cost rates for the 1987–1991 period. Instead, Data relies on the 1994 memorandum to no avail. As previously stated, the 1994 memorandum simply reflected a settlement that resolved the contractual disputes surrounding the 34 contract. In March 1993, HCFA reviewed Data's billing and determined that Data owed HCFA approximately $838,000 for the years 1987–1991. Def.'s Facts ¶ 27. Data protested, and countered that HCFA owed Data $1.5 million. *Id.* ¶¶ 28–30. HCFA concluded that it would be

in the government's best interests to close the 34 contract, in large part, because it had not complied with the contractual requirement of performing an audit or an adjustment of the indirect cost rates within ninety days after the award of the contract with a term of five years. Def.'s Facts ¶ 41; Def.'s App. at 62. HCFA also noted that the closing out of the 34 contract was necessary because it had "hired important [Data] personnel repeatedly in 1991, 1992 and 1993." Def.'s Facts ¶ 9; Def.'s App. 62. Based on these circumstances, the government entered an agreement with Data to settle the contractual disputes concerning the 34 contract. The 1994 memorandum was a reflection of the parties' mutual agreement to resolve those disputes.

In this regard, the court finds that the government's failure to audit and adjust the indirect cost rates within ninety days of the award of the 34 contract does not amount to a waiver of HCFA's right to establish final indirect cost rates or other rates in 1999. HCFA made the mistake of not complying with its contractual requirements, and, in good faith, admitted to that mistake by settling and closing out the 34 contract. *See Parsons v. United States,* 229 Ct.Cl. 335, 670 F.2d 164, 166 (1982) ("It is well established that there is a presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with the law and governing regulations, and that the burden is on the plaintiff to prove otherwise."). As a result of the parties' settlement and the government's act of closing out the 34 contract, both HCFA and Data walked away without owing money on the contract. Data cannot now use the settlement of the 34 contract to establish that HCFA waived its right to determine final indirect cost rates because nothing in the record indicates that the government voluntarily relinquished its right to set final indirect cost rates for 1987–1991. Nor can HCFA's pattern of conduct be construed as inferring a waiver because HCFA continued to negotiate final indirect cost rates with Data after 1994.

To further support its argument that the government waived its right in 1994 to establish final indirect cost rates for the 1987–1991

period, Data cites to *Gresham & Co. Inc. v. United States*, 200 Ct.Cl. 97, 470 F.2d, 542 (1972) for the proposition that "[a] contract requirement for the benefit of a party becomes dead if that party knowingly fails to exact its performance, over such an extended period, that the other side reasonably believes the requirement to be dead." *Id.* at 554. *Gresham* is distinguishable from the facts in the present case. The court in *Gresham* agreed with plaintiff's waiver argument because the facts showed that defendant had waived a specific requirement in thirty-six contracts with the same party. *Id.* at 555. Here, HCFA's single act of waiving its right to establish final indirect cost rates in the 34 contract does not extend to the government's remaining contracts with Data. *See Doyle Shirt Mfg. Corp. v. United States*, 199 Ct.Cl. 150, 154, 462 F.2d 1150 (1972) (holding that the government was not bound by its waivers in three prior contracts); *Int'l Res. Recovery, Inc. v. United States*, 60 Fed.Cl. 428, 432 (2004) (stating that a "waiver of a contractual requirement by course of dealing cannot be established by a single occurrence"); *Appeal of John Lembesis Co.*, ASBCA No. 24100, 80–2 BCA ¶ 14,571, 1980 WL 2670 (June 30, 1980) (holding that the waiver in two previous contracts was insufficient to support waiver of the contract at issue in that appeal). Furthermore, Data's negotiations with HCFA in 1995–1998 with respect to setting final indirect cost rates for the remaining contracts is an indication that Data was aware that the 1994 memorandum did not establish the final indirect cost rates for the years 1987–1991.

Finally, plaintiff's waiver argument also fails because, as previously stated, there is a genuine issue of material fact as to whether the contracting officers in 1994 established final indirect cost rates for the 1987–1991 period. Accordingly, Data is not entitled to summary judgment on waiver principles.

## CONCLUSION

Because genuine issues of material fact prevent this court from granting summary judgment setting aside the indirect cost rates for 1987–1991 set on October 29, 1999 in the contracting officer's final decision, plaintiff's

motion for partial summary judgment is denied. The court encourages the parties to settle their remaining claims. To the extent that settlement is not possible, the court reminds the parties that trial is not the only option remaining to them, because "separate summary judgment motions of each party may focus on different legal principles and posit as undisputed different sets of facts." *Massey v. Del Labs., Inc.*, 118 F.3d 1568, 1573 (Fed.Cir.1997). For example, in a different summary judgment scenario, a non-movant who bears a burden of proof at trial may lose on summary judgment for failure to allege specific facts in support of an element required for its success on the merits. *Celotex Corp. v. Catrett*, 477 U.S. 317, 324, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986).

Accordingly, it is hereby **ORDERED** that:

(1) Plaintiff's Motion for Partial Summary Judgment, filed July 24, 2007, is **DENIED;**

(2) The parties shall **FILE** a **Joint Status Report** on or before **March 31, 2007**, proposing a schedule for further proceedings in the subject matter; and

(3) No costs.